REYER *v.* PEARL RIVER TUNG COMPANY, et al.

Dec. 7, 1953

No. 38945 45 Adv. S. 73 68 So. 2d 442

212

*William H. Stewart,* Poplarville, for appellant.

*H. H. Parker,* Poplarville, for appellees.

LEE, J.

This is an appeal by Mrs. J. C. Reyer from a judgment of the Circuit Court of Pearl River County which af-

firmed an order of the Workmen's Compensation Commission denying to her certain compensation benefits.

Mrs. Reyer, an employee of Pearl River Tung Company, was injured in the course of her employment on December 19, 1949, when the truck in which she was being transported to her home, ran down an embankment and tilted over somewhat on its side. She complained of being hurt, and was taken immediately to Dr. H. B. Cowart, who, after treating her over a period of five weeks, discharged her, and notified the insurance carrier accordingly. Sometime thereafter, the carrier offered $50, being five weeks of compensation at $10 a week, but Mrs. Reyer refused to accept it. The record shows that there was correspondence between the parties and the Commission, but the matter was never concluded. Finally Mrs. Reyer employed an attorney, and he filed a formal claim on April 10, 1951, and the attorney-referee heard the controversy on June 20, 1951.

On this hearing, Mrs. Reyer testified to the manner in which the wreck occurred, namely, that the truck ran down an embankment and tilted over to the side. She was thrown over the seats to the opposite side, "the breath was knocked out of" her, and people and hampers were piled upon her. At the time she was fifty years of age and weighed 260 pounds. She complained that she was hurt in her back and side, and was taken immediately to the office of Dr. Cowart, where she told him about the accident and indicated the places on her body where she was suffering pain. The doctor strapped her back and side and sent her home. She remained in bed for eight days, during which time, the doctor visited her several times. When she got out of bed, she went to his office about twice a week for a considerable period, and thereafter about once a week or every two weeks until the date of the hearing. Following the first examination, she took regularly the medicine which had been prescribed until the last several weeks. Since that time, she took medicine

for relief only as it was needed. She remained with her back and side strapped for five weeks after the injury. At the time of the trial her weight had dropped to 220 pounds. She never had an injury before this one, but was able to, and did, put in a full day's work, sometimes with considerable overtime. She has not worked since the injury and has not been able "to even wash John (her husband) a pair of pants since then."

John Malley, the driver of the truck, gave corroboration to the manner of the injury. He testified that about three of his passengers complained of being hurt, although others may have been scratched.

Dr. H. B. Cowart testified that when Mrs. Reyer came to his office, in the late afternoon, she said that she had been in a wreck, and was complaining terribly of her shoulder, arm, side and back. However he saw no external signs of injury. He went to her home three times and she then came to his office at least once a week or every two weeks ever since. He testified that, when a patient complains of pain, the doctor takes such fact for granted, as he cannot see it. So he gave her sedatives for that purpose. His idea was that she had a neuritis. In a nerve injury, there is no sign. A·lick of the kind which she received "could upset the central nervous system to the point she would suffer a lot from it." It would be likely for her to have such injury as a result of the wreck. She walked and used her arm, but when she did so, she complained of pain, and this "probably savors of a permanent nature." The doctor admitted that he discharged Mrs. Reyer on January 24, 1950; that he gave her all of the time that he thought the Compensation Commission would allow; that patients usually snap out of such condition; but that he was not infallible. He saw her a number of times after the injury, and she still complained of pain, and, in his opinion, she was still unable to work. After observation of her for this long period of time, it was his retroactive opinion that she received

an injury to her nerves in the affected parts. He also testified that the medical profession depends on neurologists to aid them in determining whether a patient suffers pain from a nerve injury.

At this juncture, the attorney-referee, with the consent of the attorneys for the parties, ordered an examination of the claimant by Dr. F. B. Donaldson, a neurologist, who was recommended by Dr. Cowart as a competent man in that field. The examination was made and the doctor filed his report, dated July 11, 1951, with the Commission. The report gave a history of the case, consisting of the manner of the wreck and the claimant's injury and her complaint as to pain. It recited the result of various tests, and concluded that they revealed no sign of neurological disease. It observed that: ''The above complaints are rather typical of a mixed neurosis. She shows both anxiety and conversion symptoms. The distribution of her pain is typical of that of a conversion psychoneurosis. It would be hard to differentiate between a traumatic psychoneurosis and compensation psychoneurosis in this case. It is doubtful that a wreck would have produced these symptoms in an individual that did not already have a neurotic personality makeup. It is possible that the accident was a precipitating factor. There was no neurological disease that would prevent her from working at this time.''

The evidence of the claimant showed a wreck of the truck and her immediate complaint. This was corroborated by the driver of the truck, who also testified that other passengers were slightly injured at the time. An examination forthwith by the doctor, while finding no external evidence of injury, was such that he strapped her back and side and gave her medicine to relieve pain. He attended her in her home until she was able to come to his office. His opinion was such that, after treating her for five weeks, he could discharge her; but when the pain persisted, since he was not infallible, he came to the

conclusion that she had developed a neuritis, following the injury, and that it was the cause of her pain. Dr. Cowart was evidently of the opinion that Mrs. Reyer was in good faith. The very fact that he continued to see her and give medicine over this long period of time indicates clearly that he did not even have a suspicion that she was malingering. Although Dr. Donaldson found no evidence of neurological disease, the report is wholly silent as to the cause of her pain.

 Under the proof in this case, it seems conclusive that this woman received an injury and has suffered considerable pain ever since, and, on that account, she has been rendered unable to work. Dr. Cowart attributed this condition to a neuritis. Dr. Donaldson could find no neurological disease which should prevent her from working, but he, in no way, accounted for her pain and, in no way, controverted the fact that she has such pain. The fact of disability by reason of pain, therefore, exists. The inability of doctors to put their fingers on the exact physical cause should not result in casting the claim overboard. With all of the knowledge now possessed by the great medical profession, it is a matter of common knowledge that sometimes the diagnosis of human ailments baffles the greatest medical minds.

 The evidence for the claimant was neither disputed nor contradicted in its material features. It was not inherently improbable, incredible, unreasonable, or untrustworthy. In such circumstances, it should not be arbitrarily and capriciously rejected. See 32 C. J. S., Evidence, Section 1038, pp. 1089-92: "Uncontradicted or undisputed evidence should ordinarily be taken as true. More precisely, evidence which is not contradicted by positive testimony or circumstances, and is not inherently improbable, incredible, or unreasonable, cannot be arbitrarily or capriciously discredited, disregarded, or rejected, even though the witness is a party or interested; and, unless shown to be untrustworthy, is to be taken as con-

clusive, and binding on the triers of fact; and where the evidence tends to establish a fact which it is within the power and to the interest of the opposing party to disprove, if false, his failure to attempt to disprove it strengthens the probative force of the evidence tending to prove it. Where there are no contradictions, the evidence of a witness must be considered as a whole and in the setting in which it was given.''

Besides, the appellees had good reason to believe, after Mrs. Reyer refused to accept five weeks of compensation in full payment of her disability, that this matter would be controverted. Consequently, they had ample time to obtain proof as to what she was doing, as to whether she was in good faith, and as to whether she was malingering, consciously or otherwise. But they offered not a word of testimony to dispute or discredit the evidence for her.

Even in criminal cases, where the defendant is the only witness, his version, if reasonáble, must be accepted as true unless substantially contradicted in material particulars by the physical facts, or by the facts of common knowledge. Westbrook v. State, 202 Miss. 426, 32 So. 2d 251; Weathersby v. State, 165 Miss. 207, 147 So. 481.

 In our opinion, the evidence showed conclusively that Mrs. Reyer was disabled to work and, therefore, was not only entitled to compensation for the five-week period, but also for each week thereafter at $10 a week to the date of the hearing, and is likewise entitled to such amount weekly thereafter, during the continuance of her disability, as provided by law.

In view of the above conclusion, it is not deemed necessary to go into the question of traumatic or compensation psychoneuroses, which were referred to in the report of Dr. Donaldson, and as to which, there is much authority in the books. Some of them are Vol. I, Larson's Compensation Law, Section 42.22-42.24, pp. 616-21 inclusive; Hood v. Texas Indemnity Insurance Company, 209 S. W. 2d 345.

The judgment of the attorney-referee, as affirmed by the Commission and the circuit court, insofar as it denied compensation at the rate of $10 a week from and after January 24, 1950, until July 25, 1951, the date of the order thereon, is reversed, and a judgment will be entered here for the appellant for such benefits, together with lawful interest.

The record does not, and could not, show whether this disability has continued. Consequently, the cause is remanded so that the Commission may determine that question in accordance with development since July 25, 1951.

Reversed, judgment here for appellant, and remanded.

*Hall, Kyle, Holmes* and *Arrington, JJ.,* concur.

LOTTERHOS, J., dissenting:

It stands admitted in this case that appellant suffered a compensable injury on December 19, 1949. The only question before the Court is whether there is substantial evidence in the record to support the finding of the attorney-referee, affirmed by the commission and by the circuit court, that appellant was only temporarily disabled for a period of five weeks. If there is substantial evidence in support of this finding, then the attorney-referee and the commission did not act arbitrarily, and their decision should be affirmed on judicial review. Barry v. Sanders Co., 211 Miss. 656, 52 So. 2d 493, Decmer Lumber Co. v. Hamilton, 211 Miss. 673, 52 So. 2d 634; Thornton v. Magnolia Textiles, Inc., Miss., 55 So. 2d 172; Fischer v. Gloster Lumber etc. Co., Miss., 57 So. 2d 871; and Mastin & Co. v. Mangum, 215 Miss. 454, 61 So. 2d 298.

In the majority opinion, this Court has reviewed the evidence, and has found that it "showed conclusively" that Mrs. Reyer was "disabled to work" up to the date of the attorney-referee's order—July 25, 1951—over a year and a half after the injury. It seems to me that it

is error for this Court to substitute its finding of fact for that of the attorney-referee and the commission on this record, for it seems to me that they had a sufficient basis in the evidence to determine whether the injury was temporary or permanent. See my specially concurring opinion in Carrie Cowart, Guardian v. Pearl River Tung Co., et al., Miss., 67 So. 2d 356, 361, for a discussion of a similar situation.

It is necessary for me to refer to some of the matters disclosed by the record, in order to make my views clear.

In December, 1949, Mrs. Reyer was employed in harvesting tung nuts. She was injured on December 19, while being transported to her home from her work. They had started the work in October. Her last work prior to that was in a packing plant, during the tomato season, in the preceding spring.

Her family physician, Dr. H. B. Cowart, made his final medical report on March 8, 1950, certifying that she was discharged as cured and able to return to work on January 24, 1950. Mrs. Reyer declined to accept the compensation tendered to her for five weeks' disability, based on the doctor's report. Thereafter, on April 10, 1951, she filed her notice of claim with the commission, and on May 25, 1951, she filed her formal claim. The trial before the attorney-referee was on June 20, 1951. The hearing was recessed to permit the examination of Mrs. Reyer by a neurologist, which examination was made on July 11, 1951, and the attorney-referee made his finding and order on July 25, 1951. The full commission affirmed on September 25, 1951, and later the circuit court affirmed.

We now come to the evidence and the record with respect to whether it is conclusively shown that Mrs. Reyer's injuries totally disabled her up to July 25, 1951, or whether there was a substantial basis for finding merely temporary disability. The only witnesses were: Mrs. Reyer, the claimant; Dr. Cowart, her physician; John

Malley, who did not testify about the extent of her injuries; and Dr. Frank A. Donaldson, a neurologist and psychiatrist, who examined Mrs. Reyer by consent of all parties and made a written report. Dr. Donaldson did not testify in person, but both sides had the opportunity to cross-examine him, and declined to do so.

The sworn testimony of Mrs. Reyer with respect to her injuries and disability was limited to the following. She described the accident of December 19, 1949, and, when asked what happened to her, replied, ''Well, for a while I don't remember because the breath was knocked out of me so and so many piled on me until they got them out I hardly remember until they got them out what happened, but after they got them out I realized I was hurt.'' In answer to a similar question she said, ''Well, I fell to the other side of the truck body, across the other seats, across the side, and there was no telling who all and hampers piled on top of me until they could get them up and out.'' Her testimony then continues:

''Q. You said this side, Mrs. Reyer, and put your hand on your back, that is the left portion of your lower back?

''A. Yes, sir, and this whole side right across my ribs and across here, it was just mashed until the ligaments and tendons and muscles all in the side was torn loose. I stayed strapped about five weeks—well, it was five weeks.

''Q. How long did you stay in bed?

''A. I only stayed in bed eight days, but it was not because I should not have stayed, I lay there until I couldn't, I would get up and my husband would help me to sit up and rest.

''Q. How much do you weigh?

''A. The last time I weighed I weighed 220.

''Q. Did you weigh that at the time of the accident?

''A. I weighed 260.

''Q. Have you done any work whatsoever since that time, Mrs. Reyer?

"A. I have not been able to even wash John a pair of pants since then.

"Q. Have you been under a physician's care?

"A. Well, Dr. Cowart sees me once or twice a month, anyway, I just put off going to see him as much as I can, I keep medicine in my purse to keep me easy all the time."

Mrs. Reyer testified further that she had spent "quite a lot" for medicine and doctor's bills; that until lately she had gone to Dr. Cowart every week "for a long, long time;" that she had had prescriptions filled over and over; that for the last few weeks she quit taking the medicine because "it did not seem to be doing me much good at the time, I had just taken so much I just turned against it. I just take something when I have to to ease me;" and that "I have not worked anywhere since then."

On cross-examination, Mrs. Reyer stated that she had not tried to get a record of the number of times she had the prescription re-filled, and "would not say definitely" how many times, because she "swore to tell the truth" and she did not have the record. She "did take lots of it." She admitted that the commission wrote her on August 3, 1950, requesting additional doctor's reports if she was making further claim, and that she had not sent in such reports. She said that was on the advice of Dr. Cowart.

It is noted that Mrs. Reyer did not testify under oath to the nature and extent and disabling effect of her pain, except by the most general and inferential comments. She did not testify under oath that she was totally disabled from working from December 19, 1949, to June 20, 1951, when she was on the witness stand, except by similar comments. I have endeavored to set out fairly and fully all that she testified in support of total and permanent disability resulting from the accident. The commission, through the attorney-referee, saw and observed her demeanor on the witness stand.

The other evidence to be considered is that of the two doctors. The first was Dr. H. B. Cowart, who was Mrs. Reyer's family physician. He testified that in December, 1949, Mrs. Reyer came in "complaining of her arm, side and back having had a wreck, she said, fell out of a truck." He stated his finding after examining her in these words: "Well, her condition at that time, since then as far as that's concerned, was subjective in nature. She said her side was hurting her, her shoulder, arm and back, complained terribly with it. They brought her in my office in the late afternoon. I didn't see any external signs of injuries. As I said, it was all subjective." Dr. Cowart testified that Mrs. Reyer came to his office "pretty regularly for the first month," and that he went to her house about three times. She came to his office about twice a week for approximately a month. After the first month she came "once a week or two weeks." He prescribed "in the way of sedations, something for the pain she said she had." He expressed his professional opinion of what was wrong with her as follows: "Well, yes, I have an idea it was one of those cases that we see occasionally here and do find of neuritis. As I said, it has all been of a subjective nature. You can't see pain, if a patient tells you she is hurting in a certain place in a certain way you take it for granted she is."

When the accident was described, and he was asked whether "a lick like that" would be "likely to permanently injure a woman" of Mrs. Reyer's size, Dr. Cowart replied: "Well, it could upset the central nervous system to the point she would suffer a lot from it. Now I would not say it would be of a permanent nature because you do get away from those things after a while, you work away from it." As to how badly she was injured, Dr. Cowart stated: "Well, as I said, her symptoms were all subjective. She told me where she hurt, how she hurt, and has continued to tell me this. I only have her word for it. Now here a year and a half later

she still complains of it. That probably savors of a permanent nature." He stated that Mrs. Reyer had no broken bones; and that "she walked in herself, continued to walk, has handled her arms, only she does it in pain, she says."

As to whether her physical condition would allow her to pick up tung nuts, Dr. Cowart said: "Well, according, as I said, from a subjective standpoint, she can't, no, that is all I have to go on. There is no external sign of an injury, but you don't get any external signs of injury in a nerve injury. You have to go on what a person tells you about it." In answer to a leading question he said if a woman "of her size and physical condition" received a "lick like that," it would "be likely" that she would have "that injury." When asked whether he thought Mrs. Reyer was able to work, he replied: "Well, that is problematical. It might be that she possibly could, by not doing the things that it hurts her to do, with rest, develop away from it." As to whether her condition would allow her to work, he said, "No, not according to what she says." And then, to the question whether "that is entirely based on subjective symptoms?" he replied "absolutely."

The doctor testified that there was no external sign of injury when he first examined her or since; that he discharged her on January 24, 1949; that his certificate to that effect expressed his conviction at that time; that it was the result of his examination and treatment of the patient; and that he saw "no reason to change that as of that date." He said that was his definite decision when he made the report. When asked whether he had seen anything since the certificate that would change his opinion, he said: "Well, just that she still comes along and complains of it, you know, it was all, as I said, of a subjective nature. I have seen her a number of times since then and she still complains of it." The doctor then said, in answer to a leading question, that he would say she is still unable to work.

The attorney-referee then seemed to be in doubt as to whether there was a basis for an allowance for permanent disability on the proof before him. Note in that connection that Dr. Cowart had testified that there was no external evidence of injury; that the accident "could upset the central nervous system to the point she would suffer a lot from it;" that he had "an idea it was one of those cases that we see occasionally here and do find of neuritis;" that "her symptoms were all subjective;" and that she might have a nerve injury. In that situation, the attorney-referee asked Dr. Cowart some questions, as shown below:

"Q. Doctor, is it your opinion now that in this accident this woman received injury to a nerve or nerves?

"A. That would be—that would be our retroactive opinion of it, you know, that nerves do that, you know.

"Q. Yes, sir. Do you consider that this woman's injury, if there is an injury is to the nerves that are in her back or in the area where she was injured?

"A. The nerves in the area where she was injured.

"Q. Is it now your opinion that those nerves were damaged?

"A. According to her, the way she explains that condition, I say it was, yes, the only thing I have got to go on it.

"Q. Was her description of pain at that time indicative to you that those nerves had been injured?

"A. Well, yes, I would say it was.

"Q. Based entirely on symptoms she gave to you it is your professional opinion she received injury to those nerves, is that true, Doctor?

"A. Yes, sir.

"Q. Doctor, did you know, or do you know of any test made by a specialist or a test that may be made by a specialist on this woman to determine whether or not she is now suffering from injured nerves?

"A. Yes, sir, that would come under the heading of a neurologist.

"Q. Do you know such a person, Doctor?

"A. Oh, yes, yes, they have two good neurologists, outstanding neurologists, at Oschner's Clinic.

"Q. In New Orleans?

"A. Yes, sir. Dr. Donaldson at Jackson does that work.

"Q. Dr. J. B. Donaldson?

"A. J. D. I think it is.

"Q. Is it known to the medical profession such tests in your opinion that could determine whether or not this woman is at this time and at the time after your discharge of her on January 24, 1950, bona fide suffering pain from her nerve injury?

"A. From the standpoint of whatever injury might have been from the nerves, yes, nerve centers, root of the nerve.

"Q. And a neurologist would be capable of that?

"A. We depend on them for that, yes.

"Q. Is it your opinion Dr. Donaldson would be capable?

"A. Yes, sir, he is an accredited man as a neurologist."

The attorney-referee then stated that it seemed to him that Mrs. Reyer should be examined by an expert; and by consent of all parties it was arranged for Dr. Donaldson to examine her and make his report.

Dr. Donaldson, neurologist and psychiatrist, examined Mrs. Reyer on July 11, 1951, and made his written report. As to what she told him of her symptoms, he stated in the report that she "offers a chief complaint of 'I am completely dying on the left side, my left side just goes to sleep';" that "she had pain on the left side;" that this pain continued; that it was "a pleurisy type pain;" and that "she couldn't get her breath." The remainder of Dr. Donaldson's report is as follows:

"Her past history reveals no unusual illnesses or injuries, no sign of marked personality deviation, and she denied any neurotic tendencies prior to her injury.

"She complained of a pain in the right sacroiliac region and up the back on both sides. This pain goes up the back, through the neck, draws her neck backward and then goes all over her head. She states that at times she has a band-like pain around her head and that her left eye gives her trouble. She states that she has seen double more in her left eye than in her right eye. She also complains of a pain over the left side of her chest anteriorly, states that her heart runs away, turns flip flops and she has felt that she has heart trouble. She complains of a pain in the left knee like a toothache, states that her left ankle gets a catch in it and that she can hardly stand up on it. She complains of itching in the palm of her left hand.

"Neurological examination shows deep reflexes to be equal and active throughout. Muscle tone is good in all extremities. Cranial nerves are intact. Pupils are equal, react to light and accommodation. Eye grounds are normal. Vibratory sensation is normal in all extremities and there is no difference in any of the sensation tests on the right and left side. Neurological examination reveals no sign of neurological disease.

"The above complaints are rather typical of a mixed neurosis. She shows both anxiety and conversion symptoms. The distribution of her pain is typical of that of a conversion psycho-neurosis. It would be hard to differentiate between a traumatic psychoneurosis and compensation psychoneurosis in this case. It is doubtful that a wreck would have produced these symptoms in an individual that did not already have a neurotic personality makeup. It is possible that the accident was a precipitating factor. There was no neurological disease that would prevent her from working at this time."

These are the facts as disclosed by the record. The burden of proof was on the claimant to show by the evidence that she was totally disabled from engaging in her work, as a result of the accident, from December 19, 1949, to June 20, 1951 (the date of trial), in order to

recover compensation as for a permanent injury. The statute imposes upon the commission and its attorney-referee the duty and function of hearing the evidence and determining the issues of fact.

In his finding of fact in this case, after hearing the witnesses, the attorney-referee stated that he "finds and holds that the claimant here received an injury slight in nature and temporary in effect, arising out of and in the course of her such employment" and "finds and adjudges that the claim here interposed for permanent disability be and the same is hereby dismissed."

I do not see how we can say that the above finding is arbitrary and without a substantial basis in the evidence. The attorney-referee heard the claimant testify and observed her demeanor. When she was on the witness stand, and under oath, the claimant made no positive and direct statements about the nature and amount of pain she suffered between January, 1949, when her doctor discharged her, and June, 1951, nor about the continuity of such pain. In so far as her testimony is concerned, we must draw inferences from her statements about taking medicine and going to the doctor, in order to find any proof of continued pain. In like manner, we find that her testimony is quite general in regard to her inability to work as a result of this pain. A careful reading of the claimant's testimony discloses that it certainly is not sufficient, alone, to make the commission's finding arbitrary.

But the more important proof in a case like this is that which comes from the doctors. Here, we find that the family doctor, a general practitioner, in good faith discharged the claimant on January 24, 1950, as cured and able to return to work. He had seen nothing since to change his opinion except "just that she still comes along and complains of it, you know, it was all, as I said, of a subjective nature." Dr. Cowart's testimony about pain subsequent to the first five weeks was only in such

general statements as that "she still complains of it." He always pointed out that her pain was subjective. The gist of his conclusion, based on what she said to him, was that she probably suffered a nerve injury; but he did not claim to be a specialist in neurology, and stated that a neurologist would be able to determine whether Mrs. Reyer was in fact suffering from a nerve injury.

Accordingly, a competent neurologist examined the claimant. His report shows clearly that his examination resulted in a finding that she had no nerve injury or neurological disease. Every finding from that examination is that she was normal. But this doctor enumerates a long list of complaints and pains that Mrs. Reyer related to him, as of July 11, 1951. It is noted that these complaints are vastly different from those shown in Dr. Cowart's testimony.

After finding Mrs. Reyer free from nerve injury or disease, upon a neurological examination, Dr. Donaldson undertakes to account for the complaints that the patient related to him—the subjective elements, as Dr. Cowart described them. Dr. Donaldson says that they are rather typical of a mixed neurosis. But what does he say about the cause of this subjective pain and these complaints? "It is doubtful that a wreck would have produced these symptoms in an individual that did not already have a neurotic personality makeup." There is nothing in this record to indicate that Mrs. Reyer already had a neurotic personality. In fact, the report states that "her past history reveals no unusual illnesses or injuries, no sign of marked personality deviation, and she denied any neurotic tendencies prior to her injury." Dr. Donaldson found that there was "no sign of neurological disease."

The next, and concluding, statement that Dr. Donaldson makes, is: "It is possible that the accident was a precipitating factor. There was no neurological disease that would prevent her from working at this time." It has often been held that verdicts based on mere possi-

bilities cannot stand; and it would appear that, by the stronger reason, a finding that this accident did not cause a permanent disability should not be stricken down merely because it is possible that it (the accident) was a precipitating factor. Certainly, it cannot logically be said that the report of Dr. Donaldson conclusively shows that the accident of December 19, 1949, caused permanent disability.

Neither does it appear that Dr. Cowart's testimony conclusively proves permanent disability resulting from the accident. As a general practitioner, he thought that probably Mrs. Reyer had suffered a nerve injury, based on her complaints of pain. But he deferred to the experts on neurology for tests to determine this question; and Dr. Donaldson found no nerve injury.

So we have here a case where a claimant says she suffers disabling pain, but the doctors find no physical basis for it, either in the nervous system or elsewhere. In such a case, it seems to me that the fact-finding body (whether jury, attorney-referee, or commission) has the proper function of weighing the evidence, and determining whether—and to what extent—the pain actually exists, as a result of the accident.

But let us assume that the claimant here really suffers the pain of which she complains. Dr. Donaldson says— "It would be hard to differentiate between a traumatic psychoneurosis and compensation psychoneurosis in this case." Of course, if Mrs. Reyer has suffered a traumatic psychoneurosis, as a result of the accident, and is disabled thereby, she is entitled to compensation. This Court has stated, in the majority opinion, that "it is not deemed necessary to go into the question of traumatic or compensation psychoneuroses, which were referred to in the report of Dr. Donaldson." However, it seems to me that, nevertheless, the Court is in effect giving its blessing to "compensation psychoneurosis," as a basis for payment, because the specialist says that it is hard to differentiate between that and traumatic psychoneurosis

in this case, and this Court is making a finding of permanent disability.

Larson states in his text on Workmen's Compensation Law (Sec. 42.24): "The most controversial mental-injury question is that of compensability of 'compensation neurosis.' 'Compensation neurosis,' which must be distinguished from conscious malingering, may take the form of an unconscious desire to obtain or prolong compensation, or perhaps of sheer anxiety over the outcome of compensation litigation—in either case producing a genuine neurosis disabling the claimant."

If the expert neurologist and psychiatrist who examined this claimant cannot differentiate between traumatic and compensation psychoneurosis in this case, it is difficult to see how this Court can do so. And yet the majority opinion finds that "the evidence showed conclusively that Mrs. Reyer was disabled to work" up to the date of the order—July 25, 1951, but the Court disclaims applying liability based on "compensation psychoneurosis."

Feeling as I do that this Court is, by its decision, invading the province of the commission as the finder of facts, I must respectfully dissent.

*McGehee, C. J.,* and *Roberds* and *Ethridge, JJ.,* join in this dissent.