INTERNATIONAL PAPER Co., et al. *v.* HANDFORD.

No. 39579          April 4, 1955          78 So. 2d 895

748

*Morse & Morse,* Gulfport, for appellants.

*Mitchell & Simmerman,* Pascagoula, for appellee.

McGEHEE, C. J.

This is an appeal from the Circuit Court of Jackson County, reversing the action of a majority of the members of the Workmen's Compensation Commission in disallowing the claim of the appellee, John Handford, for compensation, and which judgment of the circuit court reinstated the finding of the Attorney-Referee A. B. McCraw in the allowance of such claim. The proof disclosed without dispute that the workman, John Handford, while employed by the appellant International Paper Company on October 3, 1952, at Kreole, Mississippi, was engaged in operating what is known as a jackhammer or a triphammer, which weighed about 160 pounds and was worked up and down with an air-compressor. The triphammer had a pin or spike at the bottom end thereof for the crushing of concrete by the operation of this hammer; that the hammer slipped or jerked so as to throw the claimant to his knees and injure him. No claim is made that the injury did not arise out of and in the course of the claimant's employment.

He testified that he was injured near quitting time in the afternoon and that he soon went home; that the next day he reported at the plant of the International Paper Company and was thereafter given an electric light treatment for two or three hours per day for several days. He was assigned to do lighter work, but according to his testimony he finally had to quit work entirely; and it appears that he had been earning a weekly wage of $48 and that his employer, or its insurance carrier Maryland Casualty Company, paid compensation to him of $25 per week beginning about October 31, 1952, and ending on February 6, 1953. The payments were then discontinued on the alleged ground that the claim-

ant had entirely recovered from the injuries which he claimed to have sustained both to his shoulder and to his back.

On the first hearing before the attorney-referee begun on June 19, 1953, at Carthage, Mississippi, Dr. B. R. Wilson, a local physician of 21 years experience, testified that he had examined the claimant for two or three hours on March 3rd and made X-ray pictures of his spine. He testified that "they showed a gradual curving to the right." He further stated, "That means the curvature of the spine made a lesser curve on the — as the spine joints closed on that vertebra. It was wider on the outside, like a racetrack. The vertebra on the outside had a greater space (between them) than the ones on the inside." He was asked "Would you express an opinion as to what caused that condition? A. I think, and what my opinion is, that this boy has a back injury in the lumbar region and the back injury consists of one of three things, which I have found in my experience that an orthopedic surgeon sometimes has to open to be positive about his diagnosis. First, a protrusion of the intervertebral disc; a rupture of the disc or the jerking * * * of the nerve that * * * leaves the disc and starts to the leg or hip. * * *"

Dr. Wilson was further asked, "Did you detect any sciotic condition? A. That is detected by him leaning to the right immediately, and you couldn't straighten him up because you would move his leg, too." He further testified that he kept the claimant "three, four or five hours examining him; * * * he was leaning to the right, humped over and had the expression of — well it was kinda like a deaf and dumb expression of fear on his face. It was just an expression that the man was in great agony of some description, * * * ." He located a tenderness in the lumbar vertebra region. He was convinced that the claimant was not malingering because the witness was of the opinion that the claimant was of such mentality as not to have thought that he could fool

a doctor; that "I don't believe with his mental condition that he would even have sense enough to try to fool a doctor, because there is no put-on to him."

This doctor further testified that in his opinion there was a pinched nerve at the vertebra that was causing pain, and that it would require surgery to locate and remedy the condition complained of. He further testified that: "He will remain totally disabled many years, in my opinion, because the nerve that has been injured, the muscle that nerve supplies, will begin to wither, begin to form a hardening, begin to wither."

Dr. Gregory, a witness for the defendant, examined the claimant on February 2, before his compensation was discontinued on February 6, 1953. He testified that the claimant in giving the history of the case stated that an "air hammer slipped and jerked his right arm, causing a shock sensation over the entire right side of his body"; said "he continued work for a while, but that because of his condition of pain in the right shoulder and chest and back, he wasn't able to continue work." This doctor testified that "he (the claimant) answered questions slowly and vaguely and was obviously of low intellect"; the witness further said: "He complained of his back hurting him in the region of the right side, and behind the right shoulder blade, and around the backbone, in his words in the notes I made he said 'around the short ribs,' but no low back pain * * * ." This doctor also testified in substance that the condition complained of is "difficult to diagnose." He was asked, "And injury to the spine can cause considerable damage to the sciatic nerve? A. That's right. Q. And it can affect either one of the members of the lower extremities? A. That's right." He further testified that: "A ruptured disc isn't always seen on an X-Ray"; and that "a disc can be a progressive thing." He was then asked: "Matter of fact, doctor, sometimes they go for two years before they show up. That's right, isn't it? A. Oh, yes." He admitted that disc trouble or disc injury would cause

calcium deposits and that this could be very painful when it gets around the nerve.

Dr. Bland examined the claimant on November 25, 1952, and claimant in giving the history of the case said he had been injured about two months prior thereto while operating a jackhammer which had slipped, causing him to fall forward, jerking his right arm seriously, and that he was jerked with such force as to cause him to fall to his knees; that he felt pain near the lower part of the shoulder blade and the pain radiated downward in a diffused manner toward the right lower rib region. He was asked: "I think you stated, though, he would complain of pain in the right upper lumbar area? A. Along the attachment of the muscles to the ribs. Q. That could be attributable to that muscle strain? A. I would attribute it to that."

It seems that there were two hearings before the attorney-referee and that according to the testimony of Dr. Bland other X-Rays were made at the Gulfport hospital on July 22, 1953, of the lumbar spine. Also of the dorsal spine. He stated "Those X-Rays revealed a curvature or scoliosis of the dorsal spine with curvature convexed to the right at approximately 6 or 7 dorsal vertebra. * * * There was a very slight tilt of the lumbar spine but the pelvis was also tilted up on that side — it was consistent with the scoliosis which was noted * * *. Summing up on that examination, I was unable to find from physical examination any evidence of a ruptured intervertebral disc in the lumbar spine."

In other words, the testimony of Drs. Gregory and Bland was largely negative testimony, except that they couldn't locate any painful reaction by pressure on the area where the claimant was claiming that he was suffering pain, but we said in the case of Reyer v. Pearl River Tung Co., (Miss.) 68 So. 2d 442, that: "The inability of doctors to put their fingers on the exact physical cause should not result in casting the claim overboard. With all of the knowledge now possessed

by the great medical profession, it is a matter of common knowledge that sometimes the diagnosis of human ailments puzzles the greatest medical minds.''

In the instant case there seems to be no dispute in the medical testimony as to the necessity of surgery to find the condition caused by a pinched nerve as the result of an injury, and Doctors Gregory and Bland say that they were unable to find anything wrong with the claimant other than what their foregoing testimony may indicate. It was their conclusion that the claimant had recovered from his injury. Whereas, on the contrary, Dr. Wilson was positive in his diagnosis that the claimant had a continuing disability. None of the doctors would say that they thought he was malingering, and Dr. Wilson was positive that he was not.

Moreover, the claimant himself testified that notwithstanding he had a wife and four children he had not worked at all, either during or subsequent to the period for which he was paid compensation for total disability, and that he had not worked because he was unable to do so. Notwithstanding the examination of Dr. Bland on November 25, 1952, the claimant was paid total disability compensation until February 6, 1953.

■■■ We are of the opinion that under the great weight of the evidence the circuit court was not in error in reversing the finding of the Commission and in reinstating that of the attorney-referee under the holding of the cases of Reyer v. Pearl River Tung Co., supra, and Pearson v. Dixie Electric Power Assn., (Miss.) 70 So. 2d 6. Nor do we think that the cases of Railway Express Agency v. Hollingsworth, (Miss.) 74 So. 2d 754, or Sunnyland Contracting Co. v. Davis, (Miss.) 74 So. 2d 858, are controlling against an affirmance of the judgment of the circuit court appealed from under the facts of the instant case. We think that the judgment of the cir-

cuit court should be affirmed and the cause remanded for further proceedings.

Affirmed and remanded.

*Lee, Holmes, Arrington* and *Ethridge, JJ.,* concur.