445 So.2d 528 (1983)
Roosevelt MYLES
v.
ROCKWELL INTERNATIONAL, a Self-Insurer.
No. 53951.
Supreme Court of Mississippi.
December 14, 1983.
As Modified February 28, 1984.
John R. Coleman, Coleman, Breard & Walker, Tupelo, for appellant.
Wade H. Lagrone, John S. Hill, Mitchell, McNutt, Bush, Lagrone & Sams, Tupelo, for appellee.
Before WALKER, P.J., and HAWKINS and ROBERTSON, JJ.
HAWKINS, Justice, for the Court:
This is a workmen's compensation case. Six years have passed since the claimant suffered his injury. The claim was initially before the administrative judge for almost two years before resulting in a grant of *529 temporary total disability for a period of three and one-half months. The full commission affirmed this determination but amended to allow a right to re-open for a new compensation order because, "no evidence has been developed to indicate that the claimant has sustained any permanent disability or wage earning loss as a result of his compensable injury."
For over four years the administrative judge and full commission have been: reviewing the testimony of the original hearing, where examining physicians appeared by way of depositions; hearing testimony of subsequent examining physicians, psychiatrists and psychologists; listening to the claimant and to his family. They continue to fail to see the merits of Roosevelt Myles' claim and therefore, we reverse and render.
The facts are clear. Myles was injured on the job at Rockwell International when a grinding rock fly wheel, with which he was sanding table tops, flew apart. The pieces of stone struck his face and chest. He was knocked unconscious. The blow broke his jaw, several teeth, caused a concussion and severe lacerations to his face, chest, arms and shoulders. These injuries required surgery and a week of hospitalization.
Myles had a good work history up to the time of this injury. He had grown up on his father's farm and helped run it; served his country honorably for three years during World War II; returned to marry, move to Chicago, and raise and support a family by holding four steady jobs over a seventeen-year period. Myles has never been a recipient of welfare, unemployment, or Social Security. He always maintained a job, changing employment only when it bettered his position and pay. He worked for the railroad, a paint store, a hardware company, and Rockwell during his career.
All of the witnesses testified that since Myles was injured, he had been unable to perform any labor because of his condition. He attempted to return to his old job at Rockwell but was not allowed to operate the machine.
The physicians who treated Myles' physical complaints shortly after the accident revealed their findings by way of deposition.
Dr. Tutor examined Myles in the emergency room of the hospital shortly after the injury. He found: lacerations in the temple region and upper lip; that Myles had been rendered unconscious and suffered a cerebral concussion; there was no sign of intra-cranial bleeding; that he had a facial fracture which Dr. Robertson was consulted for; and he gives credit for Myles' subsequent discharge to Dr. Robertson. Examining Myles two months later, Dr. Tutor found no residual abnormality.
Dr. Brown Robertson, a doctor of the ear, nose and throat, practices a specialty of treating traumatic injury to the face and facial bones. He saw Myles at the request of Dr. Tutor. Dr. Robertson treated Myles for his broken jaw and "through and through" cheek laceration. Although x-rays showed a fracture, treatment was primarily supportive. There was evidence of blood in the sinus. He saw Myles daily until his discharge from the hospital by Dr. McDuffie a week later. He continued to see Myles in his office for four months. He found on these subsequent visits that Myles had suffered broken teeth in the accident; had "only about 70 per cent capacity to open" his mouth; and that the fractures continued to be evident but that he "expected" them to heal completely. The doctor noted that Myles lumped the facial pain and headache together; that "the pain at the site of the injury is compatible with the type injury that he had"; that a post-traumatic headache would be compatible with the concussion suffered; and "felt like from the injury he was doing well." Realizing the possibility of dizziness and headaches, Dr. Robertson felt Myles should not work equipment because he could injure himself. [Emphasis added]
Surprisingly this doctor, in his own words, "did not get around" to administering an audiogram despite having noted that Myles complained of not hearing well and the fact that his specialty includes the ear. *530 The doctor stated, "a severe blow in the region that he received could cause damage to the hearing; it certainly could."
Dr. Bowlin treated Myles for a pulmonary emboli, upon the request of a Dr. McDuffie, three months after the work-related injury. He corroborated the head injury, concussion and jaw fracture. He found a possible connection between the chest pains and head injury and x-rays did not exclude the possibility of leg and chest blood clots. Dr. McDuffie discharged Myles from the hospital.
Dr. Hawkes, a Memphis neurosurgeon, examined Myles five months after the injury at the request of Dr. McDuffie. He hospitalized Myles for nine days during which time observations were made and tests were run to observe his general condition, condition of skull and spine, eyes and nerves about the head, his motor functions, sensations, coordination and reflexes. An electroencephalogram and computerized brain scan were done. The results were a finding of reduced hearing and weakness of muscles in the lip; degenerative changes in the fifth and sixth vertebrae; a limitation of the neck and weakness of facial muscles due to the blow received. These were the only objective neurological findings made by Dr. Hawkes. Unfortunately, one will never know more about his findings than this. The deposition was taken at the request of Rockwell and no attorney was present to represent claimant Myles. It is difficult to comprehend how nine days of observation and testing could reveal so very little about Myles' condition.
Also, unfortunate, is the fact that Dr. McDuffie, one of Myles' treating physicians, was not deposed, submitted no report, nor did he appear to testify about Myles' condition at any of the numerous hearings.
A two-page report by psychiatrist Jan Goff, submitted on behalf of Myles at the second phase of the first administrative hearing, shows findings one year after the injury. They include psychiatric symptoms of "discouragement of not being able to work, and some fearfulness of reoccurrence of injuries... ." Myles exhibited average cognitive functions for remembering dates and events. He walked with a limp. There was no family psychiatric illness, no evidence of malingering or of exaggeration of illness, no reason to doubt that he had pain. Based on this medical testimony, the administrative judge awarded Myles temporary total disability which the commission affirmed with an amendment insuring the right to re-open. They also granted Myles' attorney compensation.
This Court has a difficult time finding that Roosevelt Myles was adequately represented when his attorney, at the initial hearing, had no medical testimony to present to the administrative judge and that five months later did not appear, but sent his brother to represent the claimant. The brother admitted knowing nothing about the case. Myles' attorney also failed to appear for his claimant at the deposition of Dr. Bowlin, another attorney appearing for Myles; and in not showing up at all in Memphis at the deposition of Dr. Hawkes. Myles' attorney introduced a report by Dr. Goff to the commission rather than have the psychiatrist appear in person. Dr. Goff lives and practices in Tupelo where the hearings were held before the administrative judge. His attorney also failed to take the deposition or testimony of Dr. Love or Dr. McDuffie, both treating physicians for Myles, and failed to explain in the record why their testimony is unavailable. Regardless of these oversights on the part of his attorney, the commission felt that his job had been adequately performed and awarded him 25 per cent of all compensation.
Myles, with a new attorney, petitioned for further hearings and submitted additional testimony which included that of Dr. Goff, Myles' sister and daughter, and a report by clinical psychologist Barry Ritzler, Ph.D.
Dr. Goff, in testimony at a commission-ordered hearing to re-open before the administrative judge, reviewed his earlier report and substantially enlightened his earlier findings. He found that Myles complained *531 of chest pains and back tenderness; his medical history showed a blood clot treated earlier by Dr. Bowlin. Myles walked with a limp, had pain in his legs, arms, and shoulders since the work injury.
Myles had significant symptoms that would impair his ability to function in a number of areas. He had a lot of difficulty concentrating, a slowing down  described as psychomotor retardation  physical slowdown. Myles could probably do some uncomplicated type of work but could not say what his capacity would be, but it certainly would be impaired. He could not do again what he had done before; he would be limited to a menial-type job and would be slower than average. Based on a 0-to-100 scale, he could not work on dangerous machinery at all.
Dr. Goff stated that the cause of the disability was the injury and subsequent symptoms arising from the accident; the psychiatric problems set in within three to four months of the injury and it is difficult to separate the physical from the psychiatric problems. "The injury and accident was a precipitating cause ... a precipitating force."
Again, Dr. Goff found no evidence of malingering, and stated that the difference in the initial report and his recent findings showed changes that had been gradual and for the worse. Dr. Goff found in his first report and exam that Myles was depressed and had psychosomatic complaints,
And even though it had been a year after the injury, which is longer than the usual time for traumatic neuroses or depressions to carry on, I still believed that he had a reasonable chance for recovery. Several reasons ... seemed motivated to recover ... not trying to exaggerate or prolong his symptoms ... had a reasonably good work history ... there was a statistical reason that relatively few cases of traumatic neuroses, when the trauma involved an accidental injury in one episode, carry on and become chronic illnesses. However, this appears to be the case... . that's the exception, ... the case of Mr. Myles... . on 3-31-80, ... he had a moderate degree of psycho-motor retardation ... and ... difficulty remembering recent events... . He had a rather poor ability to concentrate and, in general, his affect appeared to be more depressed than I had seen him before... . I found no evidence of psychotic type of disorganization and while the patient feels very apathetic, he denies any suicidal wishes. He describes having terminal insomnia, ... This is typical of an endogenous type of depression. Endogenous referring to a more chronic type of depression... . The patient is able to eat, but he is not enjoying eating, nor does he enjoy any of the other minor or major pleasures he used to engage in. His content still centered on his multiple physical complaints and he tends to express his depression in terms of aches and pains. I believe that touches on the reason for my difference of opinion. I thought that the patient was different. And it is based on the information that I have.
Dr. Goff states that his earlier prediction that Myles would get better was in error. He stated that the severity of Myles' problem was different on the second exam. He said that at the first exam he would not have estimated the same degree of disability as then Myles exhibited a fairly typical post-traumatic syndrome, but the more recent interview revealed that the disability had increased. His opinion was based on his history and comparing how he was doing at the time he saw him as compared to the history taken from Myles and some other informants as to how he had done before the accident. These "informants" were Myles' daughter and sister. The administrative judge delayed five months writing his opinion denying the petition to re-open and dismissing the cause, stating, "the opinion of Dr. Goff was based on hearsay ..."
The full commission delayed eight months in rendering its order to re-open Myles' claim and they granted him the right to re-open because, in their opinion, "[the] claimant has not been afforded adequate *532 opportunity to fully develop all pertinent and relevant proof related to his petition to re-open." At the commission-ordered hearing testimony was again given by Dr. Goff. Myles' sister and daughter also testified to clarify their statements referred to earlier as hearsay.
Myles' sister, Thelma Mabry, stated that Myles had no past depression or psychiatric problems. He had always held a steady job since leaving the farm and never left one job without having acquired another. Prior to the accident, Myles was a good worker, loved to go to church, had good friends, loved and played with the children and kept his home in good shape, doing all the work around the house and yard. After the accident Myles was not himself. He does not have a good memory, does not socialize, does not attend church, is not energetic, and does not do his housework. He sits around and sleeps during the day, she helps with his household chores. He has not improved. He has not worked since the accident. He is 100 per cent disabled. Myles tried to go back to work a part of a week but could not stay. He has worsened in the past six months. He "goes down in his knees" and must use a cane when walking.
Myles' daughter, Phyllis, stated that he has changed a lot since the accident. He is ill all the time, has no patience and is irritable. He was never like this before. He has to lay down and rest, does not get much sleep, is restless, has constant headaches, and has no appetite. She must put food before him and make him eat. Her father has always worked and never has drawn unemployment. Since the accident he has not gotten better. Before the injury he took "us children" everywhere but does not play or do things with "us" since the accident.
Again Dr. Goff testified, reiterated his earlier findings but added that:
The final diagnosis now is sort of a chain of events. The final diagnosis now is: (1) major depressive disorder. (2) He has psychogenic pain disorder. I believe, and there are probably some conversion reaction components in there. I do not know for sure whether the headaches that he complains of are on a post-concussion  that is physical injury  or whether they are on a post-traumatic psychiatric injury.
Dr. Goff referred to the testimony of Dr. Hawkes which had been admitted into evidence previously where Dr. Hawkes diagnosed Myles' headache as post-traumatic. Dr. Hawkes also diagnosed a concussion and Dr. Goff felt that to be significant. He explained:
It's not like in some forms of physical medicine . .. it's a different disease  you know  it's not like he had on one hand a kidney disease, and then now he has pneumonia. I see this along a continum, and as these disorders become stretched out, they do tend to become more in the range of depressive disorder. So that's really why I'm changing the diagnostic wording into a depressive, insomatization because of the chronicity, and some changes in the symptoms  mainly towards the depressive quality  lack of interest, apathy, etc.
By definition of the text, it has become chronic.
He seems to be pretty much totally disabled.
I believe he's been totally disabled the whole time.
The following was heard from Dr. Goff on cross-examination by Rockwell's attorney:
Q. We are not dealing here with a psychiatric illness, neuroses, which is generally emotionally caused anyway, are we? You can say in a case of some psychiatric illnesses that a physical injury, a trauma, a blow, or something could actually cause psychiatric illness?
A. In this case, his injury falls into the category of severity that would cause a psychiatric illness in the average person that level of trauma. It's considered that level of trauma. Injury, loss of consciousness, suddenness head injury is labeled severe *533 in the diagnostic statistical manual, and then you have  when you have that level of trauma  then you have the probability of post-traumatic stress syndrome.
Q. And he has that?
A. Yes.
On further cross-examination Dr. Goff was asked if a secondary gain was an ingredient. He answered that usually, or almost always, there was. Dr. Goff explained secondary gain is a factor in a prolonged illness. He said that it always has to be weighed and that it can constitute a financial gain or a desire for emotional attention from the family or sympathy from friends. He stated that one always has to weigh the secondary gain as secondary to the primary gain which would be the reduction of tension, anxiety or depression. He reiterated that the secondary gain has to be weighed against the primary gain.
Q. And is it not true that this secondary gain  that's the same thing as the subconscious desire for money or something else?
A. That could be one example of it, yes.
Q. Trying to get money out of this litigation, and finally succeeding in doing it  for instance, this would be a way to  you feel like this would be the acid test of determining how much of his condition is due to the secondary gain?
A. Well, it would be a test. I couldn't say it would be acid test, but a test. It would help with the information.
There is reference to Myles' inflexible personality in the record. Dr. Goff explained this by saying that Myles is "kind of an average guy who is fixed in a groove that was working for him `X' number of years." That it "makes him a bad candidate for psychotherapy." He "doesn't have the kind of flexibility which would allow a talking therapy to allow enough understanding to remove the symptoms." That the most organic therapies are all you're left with and that one could not expect much from such patients.
Dr. Goff stated that he had a problem when he first interviewed Myles and that while he agreed that Myles was disabled, he was unable to tell whether he was going to remain disabled. He said he did not think he could make a prediction on that with any reliability at that initial time.
In the administrative judge's order, issued two months after the hearing, he denied any modification and dismissed the cause. He was clearly in error in his factual findings that:
Dr. Goff's connecting [the injury to the illness] is nothing more than claimant's own subconscious mind which could be motivated for reasons of his own to create and perpetuate a disability for which there is no physical reason, it should be clear that such a connecting link is not what is contemplated by the Act and cannot be considered "causally related" to the injury. A relationship between an event and a disability existing only by virtue of a connection made by a sick mind in order to collect compensation or sympathy from one's friends is hardly considered what is essential to a claim for compensation.
And that:
Psychiatric claims by their very nature are to be regarded with suspicion and the evidence and support should be clear and convincing. What is presented in this case to the commission is a claim which was originally litigated on the basis of an alleged totally disabling physical injury. After claimant failed to acquire any testimony in support of that claim and after the decision had become final, he goes back to the psychiatrist some 15 months after his initial visit and some seven or eight months after his claim is denied and obtains an opinion that he has a depressive illness which occasions the filing of the Petition to re-open. This can only be viewed as an effort to relitigate the original case on a different theory. Since there is no evidence that claimant's disability status is changed or that there was any genuine mistake in any determination of facts at the initial hearing, it *534 seems clear that the commission does not have jurisdiction to re-open this case on either the grounds contemplated by § 71-3-53, Miss. Code Ann. (1972). Nevertheless, the commission has, in effect, "re-opened" this case and has allowed claimant to put on all his testimony which might touch upon the merits of the matter. Viewed in this light, claimant still fails to convince this Administrative Judge that there should be any change in the previous order of the commission because he has failed to show a causal connection between his psychiatric condition and the original injury within the meaning and contemplation of the compensation Act. His disease simply does not arise out of his employment and was not caused by his injury. [Emphasis added] The only connection between his condition and the injury is one that claimant's mind, for reasons of his own and perhaps even for pure economic gain, chooses to make.
Myles' attorney, on November 13, 1981, petitioned the full commission for a review but failed to get a response. On February 23, 1982, while waiting, he submitted to the commission, under Rule B-9, a report by clinical psychologist Barry A. Ritzler, Ph.D., of findings from the following tests administered to Myles: Weschler Adult Intelligence Scale, Rorschach, Bender Gestalt, House-Tree-Person Figure Drawings.
The test results clearly indicated "severe psychological dysfunction resulting from brain damage and a chronic post-traumatic stress disorder," and a score of 66 on the I.Q. test, placing him in "the borderline to retarded range of intelligence. There has been a significant deterioration in intellectual functioning since the accident." The "moderate to severe brain damage" usually accompanies "serious close-headed trauma of the sort sustained by Mr. Myles." The damage in Myles' case is located in the "lower central section of the brain  an area predominately affecting emotions and motivation." His symptoms have "an organic, and well as a functional cause."
A month later the commission affirmed the administrative judge's order and denied the additional evidence submitted pursuant to Rule B-9. The Circuit Court affirmed without comment.
The administrative judge based his final opinion on North Mississippi Medical Center v. Henton, 317 So.2d 373 (Miss. 1975). In that case, which interestingly enough also originated in Lee County, Justice Broom wrote for this Court. The issue was whether "there [was] sufficient evidence of a change in conditions to warrant the re-opening of the case and the issuance of a new compensation award." The employee had been awarded compensation by the attorney referee. The Workmen's Compensation Commission reversed, Lee County Circuit Court reversed and reaffirmed the award, and the Supreme Court reversed and reinstated the full commission's order denying compensation.
The claimant complained of back injuries and the referee ordered temporary total disability compensation based on medical evidence. Later, the claimant filed a petition with the full commission to re-open on the grounds of a change in conditions pursuant to Miss. Code Ann. § 71-3-53 (1972). In the petition to re-open the claimant alleged that since her claim had been awarded, her employment with the medical center has been refused. Claimant stated that she could not obtain similar employment because of her back surgery. This Court stated:
The commission's order held that a change in conditions must be supported by an actual physical change in the condition of the injured employee, and that the term was not intended to include "merely a change in the employment status or change in position of the employer as to the disability or value of the continued employment of the injured employee." The Circuit Court, in its reversal of the commission's order, noted that the term "change in conditions" encompassed more than just a change in physical conditions, and that the term could *535 also include the change in employment conditions.
Decisions and awards of the Mississippi Workmen's Compensation Commission may be reviewed by the commission within its sound discretion ... Upon proper proof of "change of conditions" or "mistake in the determination" of facts ...
A change in conditions is usually considered to mean a change in physical conditions due to the original injury which affects an employee's earning capacity or ability to work. 101 C.J.S. Workmen's Compensation § 854 c (1958). A change in the claimant's ability to get or hold employment or to maintain prior economic levels is by one outstanding text writer also considered to be a change in condition, even though the physical condition may remain unchanged. 3 Larson, Workmen's Compensation Law § 81.31 (1973)... .
In examining the record in this case, it is noted that at the hearing on the claimant's petition to re-open, no additional medical evidence was presented which would support a finding that there had been a change in the claimant's physical condition. Additionally, the claimant did not establish that she had been refused employment because of her disability. At 375. [Emphasis added]
Henton is not proper precedent for the facts of the instant case.
In Dunn, Workmen's Compensation § 114, one finds the following:

Mental or nervous diseases. In most cases, the decision depends primarily upon testimony relating to objective physical findings and causal connection. But there is another type of case where the medical evidence fails to trace the claimant's complaint to any physical cause, yet the claimant suffers disabling pain following an accident. In these cases, the discussion may turn to the theory of traumatic psychoneurosis as distinguished from compensation psychoneurosis or malingering. Awards have been allowed when an injury occurs and the claimant claims to suffer disabling pain, provided there is no evidence of malingering and the claimant's testimony regarding pain is not contradicted or shown to be inherently improbable, incredible, unreasonable or untrustworthy and this result has been obtained despite the fact that the medical witnesses can find no physical basis for pain.
The above cites Reyer v. Pearl River Tung Co., 219 Miss. 211, 68 So.2d 442 (1953), and M.T. Reed Construction Co. v. Martin, 215 Miss. 472, 61 So.2d 300 (1952). In Reyer, Pearl River Circuit Court affirmed the Workmen's Compensation Commission order denying benefits. Therein Mrs. Reyer was injured, along with several other employees, when the truck in which they were riding ran down an embankment and tilted over. Mrs. Reyer complained of aches and pains. Upon examination, the doctor found no external signs of injury.
His idea was that she had a neuritis. In a nerve injury there is no sign. A lick of the kind of which she received "could upset the central nervous system to the point she would suffer a lot from it." 219 Miss. at 215, 68 So.2d 442.
She was discharged by her doctor and given "all of the time he thought the compensation commission would allow: that patients usually snap out of such condition." The doctor stated that his retroactive opinion was,
That she received an injury to her nerves and the affected parts. He also testified that the medical profession depends upon neurologists to aid them in determining whether a patient suffers pain from a nerve injury. At 215-216, 68 So.2d 442.
Mrs. Reyer was examined by a neurologist who found that:
The above complaints are rather typical of a mixed neurosis. She shows both anxiety and conversion symptoms. The distribution of her pain is typical of a conversion psychoneurosis. It would be hard to differentiate between a traumatic psychoneurosis and compensation psychoneurosis in this case. It is doubtful that a wreck would have produced these symptoms in an individual that did not *536 already have a neurotic personality makeup. It is possible that the accident was a precipitating factor. At 216, 68 So.2d 442.
We held in Reyer that the woman had received an injury and that there was conclusive proof that she suffered pain and would be unable to work, stating that:
The inability of doctors to put their fingers on the exact physical cause should not result in casting the claim overboard... . The evidence for the claimant was neither disputed nor contradicted in its material features. It was not inherently improbable, incredible, unreasonable, or untrustworthy. In certain circumstances, it should not be arbitrarily and capriciously rejected. At 217, 68 So.2d 442.
To this writer, these facts and findings would be applicable in Roosevelt Myles' case.
In the M.T. Reed Construction Co. v. Martin case cited in Dunn, above, a carpenter had sustained a broken leg which resulted in a shortening of that leg by one-fourth inch. His physician and surgeon did not anticipate pain and felt that normal functions would be restored. He felt that the claimant would suffer a ten per cent permanent disability, not to exceed twenty per cent. (See pages 215 Miss. at 474-475, 61 So.2d 300) The claimant and a second doctor testified that his disability was much greater. The claimant complained of swelling and pain and the necessity of taking pain relievers and the use of liniments and pads to reduce pain and swelling. This second doctor corroborated this testimony and found atrophy in the knee joint with evidence of edema. He stated that it would be hazardous for the claimant to do the job he had before and that his work would be unsatisfactory. He declined to state a percentage of disability, but stated that it was not his opinion that the claimant could recover. This Court found:
The evidence of the two doctors is not actually conflicting, but can be easily reconciled. One doctor, on the basis of his treatment and findings at the time of discharge, was of the opinion that the disability amounted to 10 per cent, which he subsequently increased to 20 per cent. This was, in effect, a prediction as to what would happen in the future. Against such prediction was the positive testimony of the other doctor, who found the knee to be swollen; that it fluctuated in size; that the claimant suffered pain; that he was unable to work; and that he can never recover. This evidence verified and confirmed the claimant's version. At 476, 61 So.2d 300.
This Court stated that it had considered the whole evidence and that it had led to the conclusion that he was totally and permanently disabled. The recovery was limited, however, to a maximum period allowed when a loss of the use of a leg is found. (See page 478, 61 So.2d 300)
A considerable body of authority supports the proposition that the findings of fact by the Workmen's Compensation Commission must be upheld so long as those findings are supported by substantial evidence. However, this Court has held that where there is no substantial evidence to dispute the claim of the employee, a decision by the commission denying an award should be reversed. See Nassar v. Latex Construction Company of Georgia, 256 So.2d 204 (Miss. 1971).
In Masonite Corporation v. Fields, 229 Miss. 524, 91 So.2d 282 (1956), this Court found that when the decision of the Workmen's Compensation Commission is clearly erroneous and adverse to the overwhelming weight of the evidence so that the commission's order fails to carry out the beneficient intent and purpose of the Workmen's Compensation Act, this Court must reverse the order of the commission. In support of this rule, they cite:

M.T. Reed Construction Company v. Garrett, 249 Miss. 892, 164 So.2d 476 (1964); Scott v. Brookhaven Wells Service, 246 Miss. 456, 150 So.2d 508 (1963); Shannon v. City of Hazelhurst, 237 Miss. 828, 116 So.2d 546 (1959); Russell *537 v. Sohio Southern Pipelines, Inc., 236 Miss. 722, 112 So.2d 357, 113 So.2d 667 (1959); ...
In Hemphill Drug Company v. Mann, 274 So.2d 117 (Miss. 1973), this Court reviewed the claim of a man who was seriously injured while operating a delivery vehicle. Mr. Mann had a fractured leg and several other lacerations, abrasions, and contusions. While he was awaiting surgery for the broken leg, he developed a psychosis which manifested itself in hallucinations, delusions, and depersonalization. His leg healed, but he was kept on drugs for his psychosis. A little less than a year later, he sustained another injury. The treating physician of this second injury stated that there was no connection between the broken leg and the subsequent fall, but that the overuse of his medication for his psychosis had caused an organic brain syndrome.
In addressing the issue of the compensability of an emotional disorder aggravated by a work-related injury, this Court quoted Larson, The Law of Workmen's Compensation, Vol. 1A, § 42.22, Page 622.162 (1967):
When there has been a physical accident or trauma, and claimant's disability is increased or prolonged by traumatic neurosis, conversion hysteria, or hysterical paralysis, it is now uniformly held full disability including the effects of the neurosis is compensable. Dozens of cases, involving almost every conceivable kind of neurotic, psychotic, depressive, or hysterical symptoms or personality disorder, have accepted this rule... .
Professor Larson also finds authority to indicate that when an emotional weakness precedes the aggravating physical injury, the claimant may be compensated to the extent his emotional weakness has worsened or to the extent a new, more serious psychological disorder is precipitated. The learned professor states: "As in other connections, pre-existing weakness in the form of a neurotic tendency does not lessen the compensability of an injury which precipitates a disabling neurosis." [Larson, P. 26.168]
The test of causal connection between a work-related accident and a psychoneurosis subsequent to that accident is a test of "clear evidence." See Hemphill, supra; National Metal Corp. v. Huffstatler, 184 So.2d 877 (Miss. 1966); Powers v. Armstrong Tire & Rubber Co., 252 Miss. 717, 173 So.2d 670 (1965); Johnson v. Gulfport Laundry & Cleaning Co., 249 Miss. 11, 162 So.2d 859 (1964).
The record reveals that Roosevelt Myles is a 55-year-old Black man with a limited education. He served his country for three years during World War II, grew up on a farm and help run it both before the service and after, maintained a job continually for seventeen years, raised a family, and supported them. The initial finding of the attorney referee, affirmed by the commission, was that Myles had suffered a temporary total disability as a result of a work injury. The record had ample medical testimony to support this finding as well as uncontradicted medical evidence of continuing mental, emotional, and physical disorders subsequent to the accident and precipitated by only the accident. No proof of any other possible cause was presented.
Clearly an injustice has been working here: Myles' injury occurred six years ago. In that time, he has received but a few months' disability compensation. There is clear evidence that Myles was insufficiently represented by his initial attorney. It is also clear that the factual determinations of the attorney referee were in error, not supported by the testimony, and cannot be allowed to stand.
For the reasons stated, this case is reversed and rendered to award Roosevelt Myles total permanent disability with interest.
REVERSED AND RENDERED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.