982 So.2d 1013 (2008)
GOOLSBY TRUCKING COMPANY, INC. and Fleet Force, Appellants
v.
Theresa ALEXANDER, Appellee.
No. 2007-WC-00026-COA.
Court of Appeals of Mississippi.
May 20, 2008.
*1015 Joe M. Davis, New Albany, attorney for appellants.
Keith Sanders Carlton, Corinth, attorney for appellee.
Before LEE, P.J., CHANDLER and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. On November 10, 2006, the Circuit Court of Alcorn County affirmed the decision of the Mississippi Workers' Compensation Commission (Commission) that Theresa Alexander had sustained a 70% loss of wage-earning capacity as a result of a work-related injury while employed by Goolsby Trucking Company, Inc., and was, therefore, entitled to permanent disability benefits. Aggrieved, Goolsby raises two issues on appeal: (1) whether the circuit court erred in affirming the Commission's finding that Alexander's alleged injuries rendered her permanently partially disabled given that Alexander secured, but never began, a mortgage broker job in Florida; and (2) whether the circuit court erred in affirming the Commission's finding that Goolsby was Alexander's sole employer and, therefore, liable in full for the compensation for Alexander's injury. Goolsby contends that it had leased Alexander from Fleet Force (Fleet) and that Fleet was her employer for workers' compensation purposes. Finding no error, we affirm the judgment of the circuit court.

*1016 SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. In May 2002, Alexander completed an application to work as a commercial truck driver for Goolsby at its office in New Albany, Mississippi. The application listed Goolsby as the carrier. "Sport" Goolsby was the individual with whom Alexander spoke regarding her employment. Alexander filled out an authorization form allowing Goolsby to investigate her previous employment and driving record. Goolsby hired Alexander after she had passed a urinalysis. She testified that while working for Goolsby, she was paid weekly. Typically, she picked up two payroll checks from Goolsby's office, one from Goolsby and one from Fleet. Alexander testified that on the first of the month, she would usually get three checks, one payroll check each from Goolsby and Fleet, and then a bonus check from Goolsby. She stated that each year, she received a W-2 form from both Goolsby and Fleet.
¶ 3. According to Alexander, when she initially inquired as to why she was receiving two checks, she was told that Fleet handled the paperwork; therefore, Alexander was under the impression that Fleet merely handled Goolsby's paperwork and insurance. Alexander testified that there were some weeks when she would only receive a check from Fleet and some weeks when she would only receive a check from Goolsby. Alexander testified that when she was hired, Fleet never contacted her or required her to fill out any paperwork, nor did Fleet ever give her any instruction as to where or how to drive her truck. She stated that she never considered herself to be an employee of Fleet.
¶ 4. In March 2003, Alexander injured her back when she slipped and fell while walking to her trailer. Alexander did not immediately seek medical attention; however, that weekend she was unable to lie down or sit up and experienced numbness in her leg. She subsequently visited the emergency room at Magnolia Regency Medical Center in Corinth, Mississippi, where she underwent x-rays and was advised to see her family doctor. Alexander's family doctor referred her to a specialist, Dr. Glenn Crosby. When Alexander reported her injury to Sport Goolsby, she was told to fill out an accident report, which she did. The accident report has "State of Alabama" at the top and lists Fleet as the employer; however, Alexander testified that she was "almost positive" that the space for the name of the employer was not filled in at the time she filled out the report. According to Alexander, Sport Goolsby then gave the form to Teresa Dill at Fleet.
¶ 5. Approximately one week later, Alexander was contacted by Dill who authorized Alexander to see Dr. Crosby. Dr. Crosby sent Alexander to physical therapy. Initially, Alexander's medical bills were paid by Fleet. When she continued to have pain, she expressed her desire to return to Dr. Crosby, but neither Goolsby nor Fleet would pay for further treatment. Alexander testified that when Fleet was contacted for approval of her continued medical treatment, Fleet would not approve the treatment because Alexander had made more money with Goolsby than she had with Fleet; therefore, Fleet maintained that Goolsby should be responsible for paying for the treatment. When the doctor's office contacted Goolsby for additional approval, it was told to call Fleet. No additional treatment by Dr. Crosby was ever approved by Fleet or Goolsby.
¶ 6. When Alexander was no longer able to unload furniture, Sport Goolsby informed her that he was running out of destinations for her. Therefore, Alexander *1017 left Goolsby in August 2003. She bought her own trailer and leased a truck in order to work as an independent contractor. She worked as an independent truck driver sporadically until May 2004. She was unable to work from September 2003 through November 2003, following which time she worked from December 2003 until May 2004. On March 31, 2004, Alexander filed a petition to controvert with the Commission seeking workers' compensation benefits. In June or July 2004, Alexander sought treatment from Dr. James O'Brien, who diagnosed her as having protruding disks in her back. Dr. O'Brien informed Alexander that her condition was only going to get worse the longer she continued driving a truck and advised her to find another kind of employment. Alexander stopped driving a truck in July 2004.
¶ 7. Alexander testified that she took a mortgage origination course in Florida and obtained her mortgage broker's license. According to Alexander, she had secured a job as a loan officer at Friendly Financial Services in Florida, but she was financially unable to relocate. The job's pay would be commission-based only, with no salary or hourly wage. Alexander stated that she had no friends, family, or business contacts in Florida who would guarantee that she would be able to make a living being a loan officer. She confirmed that she had not made any income as a loan officer. She stated that she had no way of knowing what her income would be as a loan officer because it was based on a percentage of the price of the home to which the loan pertained and on whether the loan was a net loan or a gross loan. Alexander testified that she had applied for and received favorable responses for minimum wage jobs with Dade Corners Travel Plaza and Sears Optical in Miami, Florida; she had sought these jobs as a "back up" in case she was unable to survive on processing loans. She was, however, financially unable to relocate.
¶ 8. Alexander testified that her employment search in her hometown and surrounding areas had not been successful. She had applied, without success, at Wal-Mart, Goody's, K-Mart, Tecumseh Products, JCPenney, Kimberly Clark, Dollar General, and Marriott Town Place Suites.
¶ 9. Sport Goolsby, general manager of Goolsby Trucking, testified that the company leased its employees from Fleet because Fleet could offer health benefits and workers' compensation coverage at a "cheaper" rate. He stated that Goolsby gave Fleet a spreadsheet every week showing the amount each employee made and that Fleet would then pay the employee's wages. Sport Goolsby testified that all base salary payments to Goolsby employees came from Fleet, while Goolsby paid the bonuses if the employee ran extra miles. After Fleet paid the employee, the company submitted an invoice to Goolsby detailing the amount Goolsby owed to Fleet. Since he indicated that all of Goolsby's payments were for "bonuses," he could not explain why Goolsby's check to Alexander dated July 2, 2003, showed it was for "driver payroll."
¶ 10. With regard to the hiring process, Sport Goolsby testified that he reviewed the applications initially and, if he liked the applicant, he would fax the application to Fleet and "put [the employee] to work." He stated that Fleet had never turned down an employee that he recommended. Sport Goolsby testified that he was hiring employees for Fleet, but ultimately the employees were for Goolsby because they would be driving Goolsby's trucks. According to Sport Goolsby, he felt sure he discussed the arrangement with Fleet when he hired Alexander because he did so with all of his drivers. He stated that *1018 he always told them when and how they would get paid, how much they would make per mile, and when they could pick up their checks. Sport Goolsby testified that benefits were offered through Fleet, not Goolsby. He stated that Fleet carried the workers' compensation insurance on Alexander and paid the taxes on her. He further testified that he felt sure Goolsby submitted a W-2 or 1099 form on the bonus payments. He stated that documents like the drug-use policy and the safety regulation manual were printed on Goolsby letterhead due to Department of Transportation requirements and the fact that Goolsby would be liable for any damage caused by any of its drivers.
¶ 11. According to Sport Goolsby, Goolsby's relationship with Fleet had been in existence for approximately twelve or thirteen years and had been negotiated between his father and Fleet. Sport Goolsby testified that Goolsby and Fleet entered into a written service agreement on June 15, 2003, which obligated Fleet to provide employees to Goolsby for a fee and specifically stated, "Each employee will be employed by Fleet which will make all decisions concerning hiring, termination, wages, hours and conditions of employment of the employee." In accordance with the agreement, Fleet was to procure workers' compensation insurance on all employees and to indemnify the company for any workers' compensation claim it was forced to pay. Moreover, the agreement stated: "Neither Fleet nor its employees are agents, representatives or employees of Customer." Sport Goolsby testified that this agreement was the same agreement that was in force prior to Alexander's accident and that nothing had changed in the relationship between Goolsby and Fleet within the previous five years; he could not explain why there was no written agreement from prior to June 2003. However, he acknowledged on cross-examination that the particular agreement entered into evidence was between Fleet and Sport Goolsby Trucking, a separate and distinct company from Goolsby Trucking Company, Inc., which is the party in this action.
¶ 12. Sport Goolsby acknowledged that nowhere on the application that Alexander filled out did it reference her being employed by Fleet, but he stated that in order for Alexander to work for Goolsby, she would have to work for Fleet. He maintained that Alexander should have known she was working for Fleet because her paychecks, which she endorsed, were from Fleet. According to Sport Goolsby, he controlled Alexander's trucking assignments. Fleet had no involvement other than being responsible for Alexander's salary.
¶ 13. Alexander testified that she was absent from work for one week as a result of the accident. She received $110 in workers' compensation benefits. According to Alexander, this amount was too low; so she provided Dill with paperwork demonstrating that she had been receiving more money. There was an implication at the hearing indicating that Fleet had refused to pay any additional benefits to Alexander because Goolsby had misrepresented the amount Alexander was actually making.
¶ 14. The administrative law judge (ALJ) found that Alexander had suffered a 70% loss of wage-earning capacity and further found that Goolsby, as Alexander's sole employer, was liable in full for Alexander's workers' compensation benefits. The ALJ awarded Alexander permanent partial disability benefits in the amount of $153.34 per week for 450 weeks beginning on August 30, 2003.[1] The ALJ later *1019 amended her decision and increased Alexander's permanent partial disability benefits to $331.06 per week for 450 weeks. The Commission affirmed the order of the ALJ. Goolsby filed a notice of appeal in the Circuit Court of Alcorn County regarding the Commission's decision. The circuit court affirmed the Commission, and Goolsby now appeals. Finding no error, we affirm the judgment of the circuit court.

STANDARD OF REVIEW
¶ 15. "This Court's standard of review for decisions of the Workers' Compensation Commission is limited." Martinez v. Swift Transp., 962 So.2d 746, 750(¶ 15) (Miss.Ct.App.2007). "This Court will reverse an order of the Workers' Compensation Commission `only when a Commission order is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law.'" Id. (quoting Smith v. Jackson Constr. Co., 607 So.2d 1119, 1124 (Miss. 1992)). "Substantial evidence is defined as `more than a `mere scintilla,' but it does not rise to the level of a preponderance of the evidence." Id. (quoting Delta CMI v. Speck, 586 So.2d 768, 773 (Miss.1991)).
¶ 16. "In reviewing the facts on appeal, this Court's `function is to determine whether there is substantial credible evidence which would support the factual determination made by the Commission.'" Id. at (¶ 16) (quoting Hardin's Bakery v. Taylor, 631 So.2d 201, 205 (Miss.1994)). "If the Commission's findings are supported by substantial evidence, this Court is bound to accept those findings, `even though that evidence would not be sufficient to convince us were we the fact finders.'" Id.

ANALYSIS
I. Whether the Commission's finding that Alexander had suffered a 70% loss of wage-earning capacity and is, therefore, entitled to permanent partial disability benefits was supported by substantial evidence.
¶ 17. Goolsby contends that the Commission's award of permanent partial disability benefits to Alexander should be reversed because the ALJ's finding that Alexander suffered a 70% loss of wage earning capacity was not supported by substantial evidence. Goolsby argues that because Alexander refused to begin her new job as a mortgage broker in Florida, her expected income from such job was unknown; therefore, the ALJ could not accurately determine Alexander's loss of wage-earning capacity. According to Goolsby, the ALJ had a duty to investigate Alexander's future wage-earning capacity as reflected by her expected income from the mortgage broker job in Florida.
¶ 18. "Disability" is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of the injury in the same or other employment." Ga. Pac. Corp. v. Taplin, 586 So.2d 823, 828 (Miss.1991) (quoting V. Dunn, Mississippi Workmen's Compensation, § 72 (3d ed.1982)). "A conclusion that the employee is disabled rests on a finding that the claimant could not obtain work in similar or other jobs and that the claimant's unemployability was due to the injury in question." Id. (citing Dunn, § 72.1). "If the claimant successfully establishes a disability and the injury suffered is not specifically scheduled by the Workers' Compensation statute, the claimant's disability is measured by loss of wage-earning capacity." Id. (citing Miss. Code Ann. § 71-3-17(25) (1972); Dunn, *1020 § 86; Robinson v. Packard Elec. Div. Gen. Motors Corp., 523 So.2d 329, 331 (Miss.1988)).
¶ 19. "Mississippi Code Annotated section . . . 71-3-3(i), provides that the party claiming disability benefits bears the burden of making a prima facie showing that he has sought and been unable to find work `in the same or other employment.'" Whirlpool Corp. v. Wilson, 952 So.2d 267, 272(¶ 19) (Miss.Ct.App.2006) (citing Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1226 (Miss.1997)). "Once a prima facie case for total disability has been established, the employer bears the burden of proving that the claimant has suffered only a partial disability or no loss of wage-earning capacity." Id. The employer may meet this burden by producing "evidence showing that `the claimant's efforts to obtain other employment was a mere sham, or less than reasonable, or without proper diligence.'" Id. (quoting Hale, 687 So.2d at 1227).
¶ 20. The record reveals that Alexander applied at numerous establishments in her hometown and surrounding areas in Mississippi but was unsuccessful in finding employment. Goolsby does not dispute the ALJ's finding that Alexander reasonably sought other employment. Rather, Goolsby argues that because Alexander actually obtained a job as a mortgage broker in Florida, she was required to begin work at this job. Goolsby further argues that Alexander's failure to do so renders the ALJ's finding that she had suffered a 70% loss of wage-earning capacity unsupported by substantial evidence because Alexander's loss of wage-earning capacity was dependent upon how much she was to earn in her new profession. We disagree.
¶ 21. With regard to a claimant's duty to "make a reasonable effort to secure other [comparable] gainful employment," the Mississippi Supreme Court has held that "[t]he law does not require that [a claimant] move to another part of the state, but he must cast his eyes further than across the street." Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1249 (Miss. 1991) (modified on other grounds) (citing Piper Indus., Inc. v. Herod, 560 So.2d 732, 735 (Miss.1990); see also Pontotoc Wire Prods. Co. v. Ferguson, 384 So.2d 601, 603 (Miss.1980)). Therefore, Alexander was not required to move to Florida in order to satisfy her duty to seek other employment.
¶ 22. Goolsby argues that Alexander failed in her duty to disclose adequately and fully the income she expected to receive as a mortgage broker in Florida. According to Goolsby, it is "implausible, and even naive, to enter a specialized school, pass a state licensing exam, secure a job in one's chosen profession, and be completely ignorant regarding the expected income." Goolsby maintains that Alexander should at least have had a reasonable expectation of her future income.
¶ 23. Again, we disagree. Alexander testified at the hearing that the pay from the mortgage broker job would be commission-based only, with no salary or hourly wage. As far as how she would originate loans, Alexander stated that she would not "go out and get a mortgage"; rather, she would either go online and "buy leads" or try to contact some of the real estate brokers in the area for leads. Alexander stated that she had no friends, family, or business contacts in Florida[2] who would guarantee that she would be able to make a living being a loan officer. She further stated that she had not made any income *1021 as a loan officer. She stated that she had no way of knowing what her income would be as a loan officer because it was based on a percentage of the price of the home to which the loan pertained and on whether the loan was a net loan or a gross loan.
¶ 24. Therefore, any income Alexander could have expected to earn as a mortgage broker in Florida was entirely dependent upon (1) whether she was able to secure a loan; (2) the price of the home for which the loan was needed; and (3) whether the loan was a net or gross loan. Accordingly, we fail to see how Alexander could have predicted an expected income. Goolsby argues that a report by the 2004 United States Department of Labor estimated that an individual with Alexander's level of experience, entering a "professional specialty" field, earns an average wage of $38.19 per hour in the Tampa/St. Petersburg/Clearwater, Florida market. However, this information was not made a part of the record of the proceedings before the ALJ; therefore, it is not to be considered by this Court on appeal. See Brown v. State, 965 So.2d 1023, 1027(¶ 12) (Miss. 2007) (quoting Pulphus v. State, 782 So.2d 1220, 1224(¶ 15) (Miss.2001) ("This Court will not consider matters that do not appear in the record, and it must confine its review to what appears in the record.")). Moreover, even assuming that the information was properly before the Court, it would not change our conclusion given that Alexander was not required to move to Florida in order to satisfy her duty to seek other gainful employment.[3] Accordingly, this issue is without merit.
II. Whether the ALJ erred in finding that Goolsby was Alexander's employer and, therefore, solely liable for her workers' compensation benefits.
¶ 25. Goolsby argues that the ALJ erred in finding that Goolsby was Alexander's sole employer. Goolsby contends that Alexander's actual employer was Fleet, and her relationship with Goolsby was that of a loaned servant; therefore, Fleet should be responsible for paying Alexander's workers' compensation benefits. Alternatively, Goolsby argues that Alexander was a dual employee of both Goolsby and Fleet, and thus, the liability for Alexander's benefits should be shared equally between the two companies.[4]
*1022 ¶ 26. With regard to this issue, the ALJ found the following:
Additionally, it is the opinion of the undersigned that [the] claimant was the employee of Goolsby Trucking Company. [Ms. Alexander] testified that on May 5, 2002, she completed an application for employment with Goolsby in New Albany, Mississippi. At that time, she met with Goolsby's corporate representative, Sport Goolsby. Further, [the] claimant confirmed that Exhibit "7", composed in part of the "Investigation Into Previous Employment" form executed by Ms. Alexander was witnessed by Pam Goolsby Walker. Claimant Exhibit "9", entitled, "Goolsby Trucking & Service Center Statement of Policy Drug Abuse", was executed by Ms. Alexander on May 11, 2002, and Pam Walker signed as the [c]ompany's [r]epresentative.
Further, Ms. Alexander was paid by Goolsby and Goolsby Trucking submitted W-2 forms on the claimant. Although a July 2003 service agreement between Goolsby Trucking and Fleet Force was admitted into evidence as Exhibit "4", this agreement was executed post-accident and, as such, is not pertinent to this case. Based on the evidence, it is the opinion of the undersigned that Ms. Alexander was an employee of Goolsby Trucking Company and, as such, it is responsible in this matter.
A. Was Alexander a loaned servant of Goolsby?
¶ 27. Goolsby's primary argument is that the relationship between itself and Alexander was that of a loaned servant. With regard to the loaned servant doctrine, the Mississippi Supreme Court has stated:
The general rule as applied at common law, is that a servant, in general employment of one person, who is temporarily loaned to another person to do the latter's work, becomes, for the time being, the servant of the borrower, although he remains in the general employment of the lender. The borrower then becomes the employer to the exclusion of the lender. Application of the rule depends upon the question of whose work is being performed, and if the lender is to escape liability, it must appear that the servant is under the borrower's exclusive control and direction as to the work in progress. When an employee voluntarily accepts and enters upon such an assignment, he ceases to be in the course of the employment by the lender or the general employer. However, while the "loaned servant" doctrine is generally considered applicable in the compensation field, a shift of emphasis will be noted as to three pertinent questions involved, viz.: (1) whose work is being performed, (2) who controls or has the right to control the workman as to the work being performed, and (3) has the workman voluntarily accepted the special employment.
Jones v. James Reeves Contractors, Inc., 701 So.2d 774, 778-79 (Miss.1997) (quoting Quick Change Oil and Lube, Inc. v. Rogers, 663 So.2d 585, 589 (Miss.1995)).
¶ 28. Goolsby donates an extensive portion of its brief to analyzing the above factors and arguing that such analysis leads to the conclusion that Alexander was loaned to Goolsby by Fleet. Goolsby argues that because Alexander was not informed of and did not consent to the loan arrangement, her general employment relationship with Fleet was never suspended. *1023 See Dunn, § 186.[5] Therefore, Goolsby contends that Fleet remained Alexander's employer; thus, Fleet is responsible for paying her workers' compensation benefits.
¶ 29. Goolsby's argument in this regard, however, misses the mark. Application of the loaned servant doctrine presupposes the initial existence of a general employment relationship between an employer and employee and the act of loaning the employee to a different employer. Thus, in order for the facts of this case to fall within the ambit of the loaned servant doctrine as argued by Goolsby, the record would have to evince a general employment relationship between Alexander and Fleet and a loan of Alexander from Fleet to Goolsby. As the Mississippi Supreme Court has stated:
What gives the lent-employee cases their special character, however, is the fact that they begin, not with an unknown relation, but with an existing employment relation. . . . The only presumption is the continuance of the general employment which is taken for granted as the beginning of any lent-employee problem.
Jones, 701 So.2d at 778 (citation omitted); see also Dunn, § 186 ("Once general employment is shown, the presumption is that the employee continues under such employment until a new temporary employer has been clearly substituted. . . .") (emphasis added). As Alexander points out, if she had applied to work at Fleet, been hired, and then been sent by Fleet to work for Goolsby, Goolsby's argument might have some merit. Here, however, in finding that Goolsby was Alexander's employer, the ALJ noted the following facts that contradict the finding of a general employment relationship between Alexander and Fleet: (1) Alexander applied to work for Goolsby at Goolsby's headquarters, where she met with Goolsby's representative, Sport Goolsby; (2) she filled out an authorization form allowing Goolsby to investigate her previous employment and driving record, which was witnessed by Pam Goolsby Walker; and (3) she was issued a drug abuse policy statement with Goolsby's name on it, and Walker signed the statement as the company's representative. Moreover, Alexander testified that she was never aware of an employment relationship between herself and Fleet. Therefore, despite Goolsby's arguments to the contrary, the facts of this case do not evince an initial general employment relationship between Alexander and Fleet; rather, they evince such a relationship between Alexander and Goolsby.
¶ 30. Goolsby contends that the service agreement between Fleet and Goolsby indicates that Fleet was Alexander's actual employer. While the terms of a properly executed service agreement, when considered in isolation, might be indicative of a loaned servant arrangement between Goolsby and Fleet, the ALJ found that the agreement was executed post-accident and, therefore, was irrelevant to *1024 the facts of this case. Goolsby relies on Sport Goolsby's testimony that the contract exemplified the relationship between itself and Fleet; however, it is the responsibility of the ALJ and the Commission to judge the credibility of witnesses, not this Court. Barber Seafood, Inc. v. Smith, 911 So.2d 454, 461(¶ 27) (Miss.2005) (citing Miller Transporters, Inc. v. Guthrie, 554 So.2d 917, 918 (Miss.1989)). In finding that the service agreement admitted into evidence was irrelevant, the ALJ and the Commission impliedly found that Sport Goolsby's testimony in this regard was not credible, and we are not permitted to question this finding on appeal. Moreover, the testimony at the hearing before the ALJ revealed that the parties to the particular service agreement entered into evidence were Fleet and Sport Goolsby Trucking, not Goolsby Trucking Company, Inc., which is the party in this action. Therefore, we find no error in the ALJ's conclusion that the service agreement was irrelevant to this action. Without the service agreement, there is a dearth of evidence indicating that Alexander was a general employee of Fleet who was then lent to Goolsby. Accordingly, we reject Goolsby's argument that the ALJ erred in failing to find that the relationship between Alexander and Goolsby was that of a loaned servant.
¶ 31. Even if we were to find that the relationship between Goolsby and Alexander was that of a loaned servant, application of the Jones factors would indicate that the borrower, Goolsby, became the employer to the exclusion of the lender, Fleet. With regard to the first factor, all of the work being performed was that of Goolsby, i.e. truck driving. See Honey v. United Parcel Service, 879 F.Supp. 615, 619 (S.D.Miss.1995).[6] As for who controlled Alexander, the Mississippi Supreme Court has stated that "[t]he traditional test of the employer-employee relationship is the right of the employer to control the details of the work." Ray v. Babcock and Wilcox Co., 388 So.2d 166, 168 (Miss.1980) (quoting Biggart v. Texas Eastern Transmission Corp., 235 So.2d 443, 444 (Miss. 1970)). The supreme court has stated:
The right to control the employee has been one of the dominant factors in all the cases, but the ultimate right to control should not be confused with immediate control, for it is the reserved right of control rather than its actual exercise that furnishes the true test of relationship; and he is master who has the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate results and in all its details, and the fact that the borrower gives information and directions to the servant as to the details of the work or the manner of doing it does not make the general servant of the employer the servant of the borrower.
*1025 Clark v. Luther McGill, Inc., 240 Miss. 509, 519-20, 127 So.2d 858, 862 (1961) (citation omitted). Here, the record reveals that Goolsby controlled Alexander's trucking assignments with no input from Fleet; Fleet had no involvement other than being responsible for the payment of Alexander's salary. See Colbert v. Mississippi Marine Corp., 755 So.2d 1116, 1122-23 (¶¶ 20-22) (Miss.Ct.App.1999) (finding that a general laborer who was leased to work at another company's job site was under the control of the operations manager of the borrowing company because he was supervisor of the foremen at the job site who, in turn, gave orders directly to the employee; the lending company paid the employee and carried workers' compensation insurance on him, but the company was reimbursed for such payment by the flat hourly rate it charged to the borrowing employer).
¶ 32. Goolsby argues that although Alexander drove Goolsby's trucks, Goolsby did not have the ultimate authority to hire or fire any drivers; rather, that authority rested with Fleet. However, Sport Goolsby testified that Fleet had never turned down an employee that he recommended. While the service agreement between Fleet and Sport Goolsby Trucking states that "[e]ach employee will be employed by Fleet which will make all decisions concerning hiring, termination, wages, hours, and conditions of employment of the employee," we found above that the ALJ did not err in determining that the service agreement was irrelevant to this action. Without this agreement, we can discern no evidence in the record indicating that Fleet had the ultimate authority to fire Alexander. There is simply a lack of evidence that Fleet had the "supreme choice, control and direction" of Alexander.[7]Clark, 240 Miss. at 520, 127 So.2d 858.
¶ 33. Finally, we find Goolsby's argument that Alexander's failure to consent to the purported lease agreement between Goolsby and Fleet to be without merit. Even if we accept Goolsby's argument that it occupied the position of "special employer" in the arrangement between itself and Fleet, it is clear that although Alexander may have been unaware of any agreement between Goolsby and Fleet, she accepted Goolsby as her employer. It was Fleet, the general employer in Goolsby's scenario, to which Alexander did not consent. Thus, this factor leads to the conclusion that Goolsby became Alexander's employer to the exclusion of Fleet. Accordingly, as all three of the Jones factors point to Goolsby as being Alexander's employer for the purposes of workers' compensation, application of the loaned servant doctrine to the facts herein would not alter our conclusion that the ALJ did not err in holding Goolsby responsible for Alexander's workers' compensation benefits.
B. Was Alexander a dual employee of both Goolsby and Fleet?
¶ 34. Goolsby next argues that if we do not find the existence of a loaned servant relationship, we should find that Alexander was a dual employee of both Goolsby and Fleet and should apportion *1026 joint liability between the two companies for Alexander's workers' compensation benefits.
¶ 35. "Mississippi has long embraced the concept of `dual employment'; thus, `. . . when an employee is engaged in the service of two (2) employers in relation to the same act (dual employment), both employers are exempt from common law liability, although only one of them has actually provided workmen's compensation insurance.'" Liberty Mut. Ins. Co. v. Holliman, 765 So.2d 564, 568(¶ 9) (Miss. Ct.App.2000) (citation omitted). Dunn states:
If the employee is in the course of employment by both at the same time, the liability will be jointly imposed. Given the fact of dual employment, it is also generally held that joint liability follows if there is any evidence of joint service at the time or if the matter of joint service is left in substantial doubt.
Dunn, § 185. Goolsby contends that the fact that Alexander was compensated by both itself and Fleet indicates that she was acting in the course of both companies' employment. We disagree.
¶ 36. Initially, we note that "[i]n the case of joint service, the employee may recover compensation from either employer or from both jointly." Dunn, § 185; Holliman, 765 So.2d at 569(¶ 10) (affirming the imposition of joint and several liability after finding a dual employment and joint service relationship); Larson's Workers' Compensation Law, § 68.05 ("The normal consequence of joint employment is an award calling for joint and several liability, usually without apportionment.").[8] Therefore, even assuming that Alexander was an employee of both Goolsby and Fleet, she would still be entitled to seek compensation from Goolsby alone.
¶ 37. Nonetheless, we find no error in the ALJ's finding that the relationship among Alexander, Goolsby, and Fleet was not one of dual employment. Goolsby relies on the fact that Alexander was compensated by both Goolsby and Fleet and that Goolsby and Fleet both benefitted from Alexander's work: Goolsby in the form of completed deliveries and Fleet in the form of having leased a productive and efficient employee for profit.
¶ 38. The record reveals that Fleet was responsible for issuing Alexander a check for her base salary each week while Goolsby was responsible for paying Alexander's bonus payments. However, although Fleet did pay Goolsby's base salary, the company was reimbursed weekly by Goolsby for such payment. Sport Goolsby testified before the ALJ that he would send Fleet a spreadsheet detailing the amount each employee was owed, following which Fleet would issue the employee a check for his or her base salary. Then, Fleet would send Goolsby an invoice detailing the amount Goolsby owed to Fleet. Therefore, although Fleet initially paid Alexander's salary, the company was purely a conduit as Goolsby subsequently repaid Fleet for the amount of the salary. Sport Goolsby himself testified that the arrangement between his company and Fleet was *1027 merely for the purpose of securing "cheaper" workers' compensation coverage and health benefits.
¶ 39. Again, Alexander applied to work for Goolsby at Goolsby's headquarters; she met with Goolsby's representative, Sport Goolsby; she filled out an authorization form allowing Goolsby to investigate her previous employment and driving record; and she was issued a drug abuse policy statement with Goolsby's name on it. Moreover, Goolsby controlled Alexander's truck driving assignments; Fleet had no involvement other than being responsible for Alexander's salary. As was previously discussed, "[t]he traditional test of the employer-employee relationship is the right of the employer to control the details of the work." Ray, 388 So.2d at 168 (quoting Biggart, 235 So.2d at 444). Our discussion above indicates that Goolsby controlled Alexander's work and, therefore, was her employer. As the record is replete with evidence that Goolsby was Alexander's actual employer, we find that there was substantial evidence supporting the ALJ's finding in this regard.

CONCLUSION
¶ 40. In summary, we find that there was substantial evidence supporting the Commission's finding that Alexander had suffered a 70% loss of wage-earning capacity, and further that Goolsby, as Alexander's sole employer, was liable in full for Alexander's workers' compensation benefits. Accordingly, we affirm the judgment of the circuit court for the reasons stated above.
¶ 41. THE JUDGMENT OF THE CIRCUIT COURT OF ALCORN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] The parties stipulated that Alexander's average weekly wage at the time of the injury was $920 and that she reached maximum medical improvement on August 30, 2003.
[2] Alexander chose to take the Florida mortgage broker course because of the State's strong real estate market; she was not qualified to work as a mortgage broker in Mississippi.
[3] For the first time in its reply brief, Goolsby makes the specific argument that the ALJ erred in finding that Alexander was partially permanently disabled beginning on August 30, 2003, the date she stopped working for Goolsby, because Alexander purchased her own truck and trailer and worked for almost a year after that time. However, Alexander testified that during this time, she was unable to work from September 2003 through November 2003, following which she worked from December 2003 until May 2004. She stated that during this period of time, her pain became "unbearable, you know, for me getting in and out of the truck and climbing on top of the truck for me to wash my windows and stuff and then just in and out of the bunk and the bumping from the roads and stuff, the bending, lifting." As a result, Alexander stopped truck driving in July 2004. Thus, given that Alexander was only able to work sporadically before she had to stop driving a truck altogether due to her injury, we cannot say that the ALJ erred in finding that Alexander was partially permanently disabled during this time.
[4] We feel compelled to note initially that in its answer to Alexander's petition to controvert, Goolsby admitted the existence of an employer/employee relationship between itself and Alexander at the time of Alexander's injury. It was not until almost one year later that Goolsby amended its answer to deny an employment relationship between itself and Alexander and to state that Fleet was Alexander's employer. Goolsby then moved for a continuance so that Fleet could be added as a party; however, there is no indication from the record that the ALJ ever ruled on this motion. Although the ALJ's opinion lists Fleet as a party, there is no indication that Fleet was ever added as a party to this action.
[5] This noted treatise states:

If the workman voluntarily consents to the special employment and if the element of control by the borrower is present in sufficient degree to meet the `control test' in such cases, he becomes the exclusive employee of the one whose work is being performed. But if there is no such consent, express or implied, then the `contract of hire, express or implied,' as required by the Act, does not exist and the general employment is not effectively suspended insofar as the rights of the workman are concerned. In this sense, voluntary consent contemplates an understanding by the workman of the shift in employment and of the consequences thereof and a freedom from real or apparent compulsion.
Dunn, § 186.
[6] Goolsby contends that this factor is neutral because Alexander was performing the work of both Fleet and Goolsby. Goolsby argues that Alexander was benefitting Fleet by increasing the value of Fleet's commodity  "skilled, dependable, and lease-worthy workers." We disagree. In Honey, an employee worked for a temporary employment agency that had agreed to provide temporary employees to United Parcel Service (UPS). Honey, 879 F.Supp. at 616. There was a contract between the two companies providing that Express would furnish workers' compensation coverage for UPS's employees, but UPS ultimately paid Express the cost of the coverage. Id. at 616-17, 620 n. 6. In considering whether the employee was a loaned servant of UPS, the court considered numerous factors, one of which was whose work was being performed. Id. at 619. The court concluded that the temporary employment agency's "business existed solely to furnish employees to other companies so that the employees could perform the work of the borrowing employer"; therefore, all of the work performed by the employee was that of UPS. Id.
[7] In arguing that Fleet was Alexander's employer, Goolsby relies on the facts that the injury report that Alexander completed after her injury was forwarded to Fleet; that it was a Fleet employee, Dill, who followed up with Alexander after her injury; and that Fleet initially paid Alexander's medical bills. However, Sport Goolsby testified that the purpose of his company's relationship with Fleet was to secure less expensive workers' compensation coverage, and these actions of Fleet would be consistent with that purpose. Given our conclusion above that there is a lack of evidence indicating that Fleet had the right to control Alexander, we cannot say that these actions contradict the Commission's finding that Goolsby was Alexander's actual employer.
[8] We note that Larson states that "joint employment occurs when a single employee, under contract with two employers, and under the simultaneous control of both, simultaneously performs services for both employers, and when the service for each employer is the same as or is closely related to, that for the other," while "[d]ual employment occurs when a single employee, under contract with two employers, and under the separate control of each, performs services for the most part for each employer separately, and when the service for each employer is largely unrelated to that for the other." Larson's Workers' Compensation Law, § 68.01. Mississippi's definition of "dual employment" appears to coincide with the above definition of "joint employment."