CARLTON, J.,
for the Court:
¶ 1. Moore’s Feed Store Inc., Johnny Moore,[1] and Sherria Waldrop [2] (collectively “Moore’s Feed Store”) appeal the Pontotoc County Circuit Court’s judgment affirming the decision of the Mississippi Workers’ Compensation Commission (Commission), which awarded benefits to Michael Hurd. On appeal, Moore’s Feed Store raises the following assignments of error: (1) whether Moore’s Feed Store consented to refer Hurd to Dr. Wayne Terry Lamar’s care as required under Mississippi Code Annotated section 71-3-15 (Rev.2011); (2) whether Hurd made reasonable efforts to mitigate his loss of earnings; and (3) whether the administrative judge (AJ) erred in holding that Hurd’s injury occurred within the course of his regular duties. We find substantial evidence to support the Commission’s decision and affirm.
FACTS
¶ 2. Hurd is a graduate of South Ponto-toc High School, where he studied metal trade, brick masonry, and upholstery for one semester while in a vo-tech program. Hurd’s testimony indicated that his prior employment following his high school graduation consisted primarily of manual labor. Before beginning work at Moore’s Feed Store in 2005, Hurd testified that he *1014 worked at G & V Frame Shop, off and on for three years, and while there, he ran a ripsaw and drove a forklift. Hurd indicated that the job at G & V Frame Shop required him to stand for the entire work day. Hurd also worked at Action Industries, where he stood all day and ran a drill press. In addition, Hurd’s work history included previous employment at Still-creek, where he ran a ripsaw. Hurd has also worked odd jobs and yard work, which required him to stand for long periods of time.
¶ 3. Hurd testified that he worked at Moore’s Feed Store from 2005 until 2007. Hurd testified that his general obligations at Moore’s Feed Store consisted of operating a sewing machine that sewed labels on sacks of animal feed. Hurd explained that another employee filled the sacks with feed, and then Hurd pushed the sacks into a self-feeding sewing machine, which sewed the labels onto the sacks. Hurd testified that another employee stacked the sacks onto a pallet, and a forklift took each loaded pallet for loading onto a trailer truck. Hurd testified that he handled approximately 2,000 bags of feed each day.
¶ 4. Hurd testified that on some days, his duties required him to put tags on and sew up horse and cow feed. In performing these tasks, he used a hand sewer. Hurd stated that when dealing with horse and cow feed, he stacked the sacks onto the pallet himself. He explained that he sometimes loaded the sacks of feed onto the trailer himself. In those instances, Hurd testified that he might load two semi-trailers a day with sacks weighing fifty or more pounds. Hurd stated that his work obligations also required him to sweep the building on Fridays occasionally. While employed at Moore’s Feed Store, Hurd earned approximately $10 an hour, with an average weekly wage of $369.42.
¶ 5. On the date of the injury, June 14, 2007, Hurd testified that he arrived at Moore’s Feed Store for work at around 7:00 a.m. Hurd claimed that he suffered an injury approximately forty-five minutes later. Hurd explained that after cleaning up, he went to the dumpster. On his way back to the building, he “stepped back up on the concrete ledge” and injured his left knee.[3] According to Hurd, no one witnessed the injury. Hurd testified that after receiving his knee injury, he informed Johnny of the injury and asked to go home. Hurd left work, and after a few hours, he sought treatment from the emergency room at North Mississippi Medical Center of Pontotoc. Hurd thereafter traveled to Tupelo, where an MRI was performed. Hurd followed up with Dr. Ken Grinspun, an orthopaedic surgeon in Tupe-lo, who performed surgery on Hurd’s left knee. Dr. Grinspun released Hurd to return to regular work on August 16, 2007. Hurd returned to work for one day at Moore’s Feed Store. He worked until the end of that day, only to realize his inability to do the work that he previously performed. Moore’s Feed Store alleges that it paid all of Hurd’s medical bills and loss of wages from the time of the incident until Hurd’s release from Dr. Grinspun’s care.
¶ 6. In October 2007, Hurd retained the medical services of Dr. Lamar, an ortho-paedic surgeon in Oxford, with complaints relating primarily to pain and catching in his injured knee. Hurd testified that Moore’s Feed Store agreed to send him to Dr. Lamar. Hurd’s medical bills reflect that Moore’s Feed Store paid for Hurd’s medical visit with Dr. Lamar. Dr. Lamar ultimately recommended that Hurd undergo an arthroscopy of his injured knee, but *1015 Moore’s Feed Store refused to pay for the surgery. Hurd testified that he lacked the funds to pay for the medical procedure advised by Dr. Lamar.
¶ 7. Hurd testified that he has owned a lawn-mowing business since 1995, operating five months a year. Hurd indicated that prior to his injury, he earned approximately $800 per month through the lawn-mowing business. Following his injury, Hurd explained that his relatives and a family friend helped him with the business. Hurd collected the payments for the work but distributed all or part of the money to his relatives and friend as payment for their work. Hurd testified that after his injury, he earned approximately $400 a month from the mowing business.
¶ 8. According to Hurd, he has not fallen or bumped his knee since the injury at Moore’s Feed Store on June 14, 2007. Hurd continues to suffer pain in his knee and lacks the ability to stand for long periods of time, walk lengthy distances, or lift heavy objects. He testified that he lacks the ability to do the work required for his previous job at Moore’s Feed Store. Hurd also indicated that he had not yet applied for Social Security disability benefits because he desired to fix his knee in order to retain work again. Hurd testified that he had applied for work with several employers but had received no employment offers as of the date of the compens-ability hearing.
¶9. John H. Moore testified that he owns Moore’s Feed Store, a Mississippi corporation, along with his sister, Sherria, and his brother, Johnny. John testified that on June 14, 2007, the date of Hurd’s injury, Moore’s Feed Store was unable to renew its workers’ compensation insurance or liability insurance. John, however, indicated that Moore’s Feed Store had obtained workers’ compensation insurance coverage as of the date of the compensability hearing.
¶ 10. The AJ received Hurd’s medical records from North Mississippi Medical Center of Pontotoc into evidence. The records indicate that Hurd reported to the hospital on June 14, 2007, complaining of pain in his left knee. The emergency-room physician saw Hurd and ordered a x-ray of the left knee. The x-ray revealed a “minor area of cortical irregularity seen on the medial margin of the distal femur with a very small bone projection which could conceivably represent [a] tiny area of exos-tosis with no evidence of acute abnormality seen.”
¶ 11. The medical records of Dr. Grin-spun were also received into evidence. Hurd reported to Dr. Grinspun on June 15, 2007. Dr. Grinspun noticed some swelling in the left knee, and he ordered an MRI of Hurd’s knee. Dr. Grinspun prescribed Hurd a pair of crutches and some medication. Dr. Grinspun restricted Hurd from returning to work. On June 20, 2007, Dr. Grinspun noted that the MRI showed “a bucket handle tear of the medial meniscus.” He performed arthroscopic menisectomy surgery on Hurd’s left knee on June 25, 2007. On July 6, 2007, Dr. Grinspun examined Hurd, noting that his knee was stiff and sore, and he ordered physical therapy. Dr. Grinspun again saw Hurd on July 20, 2007, and determined that Hurd could return to regular work on August 6, 2007. On July 25, 2007, Hurd requested pain medication and was instructed to take Advil or Aleve for the pain. Hurd returned to Dr. Grinspun on August 1, 2007, complaining of lack of extension of the knee. Dr. Grinspun injected the knee and continued Hurd’s placement in physical therapy. Dr. Grinspun asked him to return in two weeks. On August 15, 2007, Dr. Grinspun examined Hurd and released him to work on August 16, 2007.
*1016 ¶ 12. In September 2007, Hurd returned to see Dr. Grinspun, complaining of pain in his knee. Dr. Grinspun injected the knee again and ordered a varus offloading brace. Dr. Grinspun later noted that Hurd told him that his employer refused payment for the brace. On October 10, 2007, Dr. Grinspun examined Hurd and found that he walked better, with full extension. Dr. Grinspun noted that Hurd had reached maximum medical improvement with zero impairment.
¶ 13. The AJ also received into evidence the medical records of Dr. Lamar, with Orthopaedic Surgery and Sports Medicine in Oxford. Dr. Lamar examined Hurd on October 19, 2007, for complaints of pain and catching in his left knee. Hurd told Dr. Lamar that in June “he injured his knee on his job stepping up on a concrete slab.” Dr. Lamar noted that Hurd suffered pain and effusion but no popping, locking, or giving way of the knee. Dr. Lamar asked Hurd to bring in his MRI results. Hurd returned to see Dr. Lamar on October 24, 2007, and he brought along his x-rays, MRI results, and photographs from the arthroscopy of his left knee. On November 1, 2007, Dr. Lamar wrote that he showed the x-rays and MRI of Hurd’s left knee to a radiologist who opined that no fracture existed in Hurd’s knee. Dr. Lamar informed Hurd that he thought the pain in the knee would resolve with time, but that he wanted Hurd to return to see him in two months.
¶ 14. On December 21, 2007, Hurd presented to Dr. Lamar with complaints of pain, locking, and giving way in his knee. Dr. Lamar requested Hurd undergo another MRI. On January 2, 2008, Hurd again saw Dr. Lamar and brought his new MRI results, which showed a tear of the posterior horn of the medical meniscus and a possible partial tear of the ACL. Dr. Lamar advised an arthroscopy of the knee because of the additional tear of the medial meniscus, and he opined that Hurd may need ACL reconstruction.
¶ 15. Hurd’s attorney sent a questionnaire to Dr. Lamar dated December 3, 2007. Dr. Lamar responded on June 17, 2008, indicating on the questionnaire that Hurd had suffered temporary total disability from June 2007 until the present time. Dr. Lamar did not release Hurd to return to work and assigned restrictions against certain movements, such as squatting, prolonged standing, and heavy lifting. Dr. Lamar noted that Hurd needed an ar-throscopy of the left knee to evaluate the ACL and medial meniscus.
¶ 16. Hurd followed up with Dr. Lamar on October 8, 2008, with continuing complaints of pain in the left knee. Dr. Lamar opined that the partial ACL tear had likely healed, but he again advised an arthroscopic partial medial meniscectomy and possibly an ACL reconstruction.
PROCEDURAL HISTORY
¶ 17. On August 23, 2007, Hurd filed a petition to controvert with the Commission, alleging that he sustained a work-related injury on June 1, 2007. Hurd thereafter filed an amended petition to controvert, alleging the date of injury to be June 14, 2007. After initially providing compensation, Moore’s Feed Store denied compensability. On February 4, 2008, Hurd filed a “Motion to Compel Medical Treatment and Temporary Total Disability Benefits.” A compensability hearing subsequently commenced on March 25, 2009, in the Lee County Justice Center in Tupe-lo, Mississippi.
¶ 18. On May 11, 2009, the AJ entered an order in favor of Hurd. The AJ found that Hurd suffered a compensable work-related injury. The AJ further found that Hurd had asked to see another physician after Dr. Grinspun, and Moore’s Feed *1017 Store had provided him with an evaluation by Dr. Lamar. The AJ ordered Moore’s Feed Store, as well as its president and secretary/treasurer, to pay workers’ compensation benefits to Hurd as follows:
1. Temporary total disability benefits at the rate of $246.28 a week beginning August 18, 2007, and continuing until the claimant recovers from the surgery required by the nature of the work-related knee injury and as recommended by Dr. Lamar;
2. Penalties and interest on all due and unpaid disability benefits; and
8. Provide medical services and supplies as required by the nature of the claimant’s knee injury and the process of his recovery therefrom, including but not limited to the surgery and related treatment as recommended by Dr. Lamar, pursuant to Mississippi Code [Annotated section] 71-3-15, General Rule 12, and the Commission’s Medical Fee Schedule.
The AJ also noted that Moore’s Feed Store failed to comply with its obligations under the law by not having the required workers’ compensation coverage on the day that Hurd suffered his injury.
¶ 19. Moore’s Feed Store thereafter appealed the AJ’s ruling to the Commission, which affirmed the AJ’s decision. In addition, the Commission assessed a $1,000 civil penalty to Moore’s Feed Store, along with its president and secretary/treasurer jointly and severally. Moore’s Feed Store then appealed the Commission’s decision to the Pontotoc County Circuit Court. The circuit court affirmed the Commission’s order. Moore’s Feed Store now appeals to this Court.
STANDARD OF REVIEW
¶ 20. Our scope of review in workers’ compensation cases is limited to a determination of whether the decision of the Commission is supported by substantial evidence. Whirlpool Corp. v. Wilson, 952 So.2d 267, 271 (¶ 15) (Miss.Ct.App.2006). “The Commission sits as the ultimate finder of fact; its findings are subject to normal[ ] deferential standards upon review.” Id. “We will only reverse the Commission’s rulings where findings of fact are unsupported by substantial evidence, matters of law are clearly erroneous, or the decision was arbitrary and capricious.” Id.
¶21. The Mississippi Supreme Court has stated:
We do not sit as triers of fact; that is done by the Commission. When we review the facts on appeal, it is not with an eye toward determining how we would resolve the factual issues were we the triers of fact; rather, our function is to determine whether there is substantial credible evidence to support the factual determination by the Commission.
Bryan Foods, Inc. v. White, 913 So.2d 1003, 1007-08 (¶ 17) (Miss.Ct.App.2005) (quoting S. Cent. Bell Tel. Co. v. Aden, 474 So.2d 584, 589 (Miss.1985)). Stated differently, this Court will reverse the Commission’s order only if we find that order clearly erroneous and contrary to the overwhelming weight of evidence. Id. at 1008 (¶ 17) (citing Myles v. Rockwell Int’l, 445 So.2d 528, 536 (Miss.1984)). “An appellate court may not simply reweigh the evidence and substitute its decision for that of the Commission. Indeed, this Court has a duty to defer to the Commission when its decision can be supported.” Id. (citing Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss.1988)).
¶22. “When, as here, the Commission accepts the AJ’s findings and conclusions, we review those findings and conclusions as those of the Commission.” *1018 Anthony v. Town of Marion, 90 So.3d 682, 687 (¶ 15) (Miss.Ct.App.2012) (citation omitted).
DISCUSSION
I. Employer’s Consent to Medical Care
¶ 23. Moore’s Feed Store argues that it did not consent to the services rendered to Hurd by Dr. Lamar as required by Mississippi Code Annotated section 71-3-15. Thus, Moore’s Feed Store contends that it is not liable for Hurd’s past or future medical expenses or loss of wages incurred after Dr. Grinspun released Hurd from his care on August 16, 2007.
¶ 24. Section 71-3-15 provides, in part:
The injured employee shall have the right to accept the services furnished by the employer or, in his discretion, to select one (1) competent physician of his choosing and such other specialists to whom he is referred by his chosen physician to administer medical treatment. Referrals by the chosen physician shall be limited to one (1) physician within a specialty or subspecialty area. Except in an emergency requiring immediate medical attention, any additional selection of physicians by the injured employee or further referrals must be approved by the employer, if self-insured, or the carrier prior to obtaining the services of the physician at the expense of the employer or carrier.
“Therefore, under the statute, the employee has the right to choose one competent physician and such other specialist to whom he is referred by his physician.” Mosby v. Farm Fresh Catfish Co., 19 So.3d 789, 795 (¶ 14) (Miss.Ct.App.2009). “However, ‘treatment rendered by a physician or referrals from a physician other than the original treating physician that have not been approved are not the responsibility of the employer or its insurance carrier.’ ” Id. (quoting Wesson v. Fred’s Inc., 811 So.2d 464, 467 (¶ 9) (Miss.Ct.App.2002)). “[T]he purpose of the statutory procedure for seeking medical treatment and permitting referrals from those initial physicians must in part be to systematize the means by which medical costs are to be imposed on an employer.” Wal-Mart Stores, Inc. v. Patrick, 5 So.3d 1119, 1126 (¶ 20) (Miss.Ct.App.2008) (citation omitted). “Further, “when one party is responsible for another party’s expenses, it is critical that some controls exist.’ ” Id. (citation omitted). Mississippi workers’ compensation statutes provide for costs within a chain of referral. See Miss.Code Ann. § 71-3-15. See generally Mosby, 19 So.3d at 795-96 (¶¶ 14-18) (discussing medical treatment received outside the chain of referral).[4]
¶ 25. The record shows that Hurd received medical treatment from the emergency room at North Mississippi Medical Center of Pontotoc. Hurd thereafter followed up with Dr. Grinspun, who was Hurd’s choice of specialist. In order for Hurd to receive treatment from yet another specialist, Dr. Lamar, Moore’s Feed Store must have approved such further treatment. See Miss.Code Ann. § 71-3-15(1). Regarding whether Moore’s Feed Store provided Hurd with consent to see Dr. Lamar, the AJ noted as follows:
On the day of the injury, Mr. Hurd started work at the mill at 7:00 a.m. At about 7:45 a.m., he went to the dumpster outside the building.... When he came *1019 back to the building, he stepped up on a three-foot concrete slab that served as a ledge at the door of the building.... When he stepped up, he felt a pop in his knee.
Mr. Hurd told his cousin that he hurt his knee, and then Mr. Hurd told Johnny Moore that he had to go home. He drove home in his truck and lay down until about 11:00 a.m. An hour or so later, he called his brotherf,] Tyrone[,] to take him to the hospital emergency room in Pontotoc. Mr. Hurd did not notify the employer that he was going to the emergency room. He had an x-ray of his knee at the Pontotoc hospital. The doctor there ordered an MRI, which had to be done at another facility in Tupelo. [Tyrone] took him there for the test. Then the emergency room physician referred him to Dr. Kenneth Grin-spun, [an] orthopaedic surgeon in Tu-pelo ,[5] Dr. Grinspun did arthroscopic surgery on the knee. The employer paid Mr. Hurd while he was off work and recovering from surgery, and the employer paid Dr. Grinspun’s bills.
[[Image here]]
Mr. Hurd has been temporarily totally disabled since the date of injury on June 14, 2007. After the initial emergency treatment, Mr. Hurd was treated by Dr. Grinspun until released to return to regular work on August 16, 2007. During the time Dr. Grinspun had him off work, the employer paid Mr. Hurd temporary total disability benefits. When Mr. Hurd returned to work on August 17, 2007, he worked all day but realized he was unable to do the strenuous work he had been doing at the mill. Hurd ask [ed ] to see another doctor, and the employer provided him an evaluation by Dr. Lamar on October 19, 2007. Dr. Lamar eventually determined that Mr. Hurd needed more surgery, and Dr. Lamar furthermore opined that Mr. Hurd was temporarily totally disabled from the time of the accident on June 14, 2007, until he has the recommended surgery.
(Emphasis added). The AJ made these findings of fact after hearing testimony and reviewing the evidence presented at the compensability hearing.
¶ 26. While Moore’s Feed Store asserts that no evidence exists indicating its approval of Hurd’s evaluation by Dr. Lamar, we find that the record reflects evidence of Moore’s Feed Store’s prior approval. The record contains evidence of Hurd’s request to see another physician for his continuing medical problems and evidence that Moore’s Feed Store paid for and provided the evaluation by Dr. Lamar.[6] See Miss. Code Ann. § 71-3-15 (Additional selections of physicians or referrals must be approved by the employer. If denied, the employee may apply to the Commission for approval, and a physician to whom the employee is referred by the employer shall not constitute his own selection.). Based upon the evidence that Moore’s Feed Store paid for and provided Dr. Lamar’s evaluation, we find no abuse of discretion in the award of benefits for medical services rendered and loss of wages incurred after Dr. Grinspun’s release. See Am. Partition Co. v. Thornton, 231 So.2d 190, 190-91 (Miss.1970). This issue is without merit.
II. Employment Search
¶ 27. Moore’s Food Store argues that Hurd failed to make a reasonable *1020 effort to mitigate his loss of earnings since being released from Dr. Grinspun’s care on August 16, 2007. In support of its argument, Moore’s Feed Store alleges that it attempted to reinstate Hurd’s employment and that another company offered employment to Hurd, but Hurd refused to accept the work. Moore’s Feed Store further points to the fact that Hurd failed to seek the assistance of the State Employment Commission in an effort to secure employment. After reviewing the record, we find no merit to this argument.
¶ 28. “Mississippi Code Annotated section 71 — B—3(i) [ (Rev.2011) ] provides that the party claiming disability benefits bears the burden of making a prima facie showing that he has sought and been unable to find work ‘in the same or other employment.’ ” Whirlpool, 952 So.2d at 272 (¶ 19) (quoting Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1226 (Miss.1997)). “When the claimant, having reached maximum medical recovery, reports back to the employer for work, and the employer refuses to reinstate or rehire him, then the claimant has established a prima facie showing of total disability.” Id. “Once a prima facie case for total disability has been established, the employer bears the burden of proving that the claimant has suffered only a partial disability or no loss of wage-earning capacity.” Id. (citation omitted). “In order to meet this burden, the employer may present evidence showing that ‘the claimant’s efforts to obtain other employment [were] a mere sham, or less than reasonable, or without proper diligence.’” Id. (citation omitted). The Mississippi Supreme Court, in speaking as to the duty of a claimant to “make a reasonable effort to secure other comparable gainful employment,” has held that “the law does not require that a claimant move to another part of the state, but he must cast his eyes further than across the street.” Goolsby Trucking Co. v. Alexander, 982 So.2d 1013, 1020 (¶ 21) (Miss.Ct.App.2008) (citation omitted).
¶ 29. After receiving his injury, Hurd saw Dr. Grinspun. Dr. Grinspun performed surgery on Hurd’s left knee on June 25, 2007. Thereafter, Dr. Grinspun released Hurd to work on August 16, 2007. Dr. Grinspun found in October 2007 that Hurd had reached maximum medical improvement with zero impairment. Hurd testified that after his medical release from Dr. Grinspun, he returned to work at Moore’s Feed Store for one day, only to realize his inability to complete the tasks that he previously performed for the company. Hurd thereafter saw Dr. Lamar for continued pain in his left knee. According to Dr. Lamar’s responses to a questionnaire dated June 17, 2008, Hurd suffered temporary and total disability from June 2007 onward. In response to the question of whether Hurd was released to return to work, Dr. Lamar answered negatively. Dr. Lamar also placed several restrictions on Hurd against certain movements, including squatting, prolonged standing, and heavy lifting. Hurd’s testimony indicated that all of his former employment, including his employment with Moore’s Feed Store, involved manual labor, which required these restricted movements.
¶ 30. At the compensability hearing, Hurd testified that he searched out other employment, but he was unable to obtain such employment.[7] In response to an alle *1021 gation by Moore’s Feed Store that another company had offered him employment, Hurd testified that one employer had asked him to help build furniture one day but failed to offer him regular employment. Hurd also indicated that he lacked the physical ability to complete the tasks required at his previous employment with Moore’s Feed Store.
¶ Bl. This Court finds substantial evidence to support the findings of the AJ, the Commission, and the circuit court as to this issue. This assignment of error is without merit.
III. Scope of Employment
¶32. Moore’s Feed Store argues that Hurd did not suffer his injury in the scope of his employment. In support of this claim, Moore’s Feed Store contends that Hurd was not carrying out any of his assigned duties when his injury occurred.
¶ 33. Under the Workers’ Compensation Act, an employee can recover for an accident “arising out of and in the course of employment.” Miss.Code Ann. § 71 — 3—3(b) (Rev.2011). “The statutory language ‘arising out of and ‘in the course of creates a requisite for compens-ability.” Mathis v. Jackson Cnty. Bd. of Supervisors, 916 So.2d 564, 571 (¶ 23) (Miss.Ct.App.2005) (citation omitted). “The term ‘arising out of employment’ simply means there is a causal connection between the employment and the injury.” Id. (quoting Singley v. Smith, 844 So.2d 448, 453 (¶20) (Miss.2003)). “One is injured ‘in the course of employment’ when an injury results from activity ‘actuated partly by a duty to serve the employer or reasonably incident to the employment.’ ” Id.
¶ 34. Here, the testimony presented at the compensability hearing shows that on the day of the injury, Hurd arrived for work at Moore’s Feed Store at 7:00 a.m., and that his injury occurred at 7:45 a.m. Hurd testified that he came in to work and cleaned up before going to the dumpster. Hurd argued that he had injured himself in the course and scope of his employment while stepping up on a concrete slab on his way back from the dumpster at Moore’s Feed Store. The AJ agreed and found that Hurd was acting in the course and scope of his employment when he injured himself. The AJ offered the following facts in support of her findings:
On the day of the injury, Mr. Hurd started work at the mill at 7:00 a.m. At about 7:45 a.m., he went to the dumpster outside the building. He was the only worker outside the building at that time, although there were three employees inside. When he came back to the building, he stepped up on a three-foot concrete slab that served as a ledge at the door of the building. He was not carrying anything at the time. When he stepped up, he felt a pop in his knee.
¶ 35. The record shows that Hurd’s injury resulted from activity “reasonably incident” to his general obligations at Moore’s Feed Store. Id. As such, we cannot find that the AJ, the Commission, and the circuit court erred in determining that Hurd received his injury in the course and scope of his employment with Moore’s Feed Store. This issue is without merit.
CONCLUSION
¶ 36. Based upon our review of the record, this Court cannot say that the Commission erred in finding that Hurd proved, by a preponderance of the evidence, that he sustained a compensable work-related injury. We find that the Commission’s findings were supported by *1022 substantial credible evidence. Therefore, we affirm the judgment of the Pontotoc County Circuit Court affirming the Commission’s award of workers’ compensation benefits to Hurd.
¶ 37. THE JUDGMENT OF THE PONTOTOC COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR.

. Johnny serves as the president of Moore’s Feed Store.

. Sherria serves as the secretary/treasurer of Moore's Feed Store.

. Hurd testified that the concrete ledge was approximately three feet tall.

. See also Jeffrey Jackson & Mary Miller, Encyclopedia of Mississippi Law § 76:105 (2002) ("The worker may continue treatment within this 'chain of referral’ initiated by the employer or may at some point make his own 'choice of physician.’ ”).

. The AJ recognized later in her order that the medical records presented showed that Dr. Grinspun actually ordered the MRI.

. In its reply brief, Moore's Feed Store states, "The Employer may have paid for an examination by Dr. Lamar as a second opinion, but under [section] 71-3-15, further treatment, including surgery, was never approved."

. In her order, the AJ noted that Hurd has applied for work with numerous prospective employers, including Evergreen Square Apartments, Tupelo Maintenance Shop, Breazeale Furniture, Ashley Furniture Industries, Southern Motion, Foster Flooring, Maco Management, Advanced Auto Parts, Sanford Plumbing, Premier Plumbing, Encore Furni *1021 ture, and Miss Eaton Inc. However, Hurd had not received a job offer from these companies.